458 So.2d 1315 (1984)
STATE of Louisiana
v.
Archie WILLIAMS.
No. 84 KA 0109.
Court of Appeal of Louisiana, First Circuit.
October 9, 1984.
Rehearing Denied November 21, 1984.
*1322 Ossie Brown, Dist. Atty. by Jeff Hollingsworth, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Kathleen S. Richey-Appellate Counsel, Asst. Public Defender, Baton Rouge, for defendant-appellant.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SHORTESS, Judge.
Archie C. Williams (defendant) was indicted for aggravated rape (Count I), attempted first degree murder (Count II), and aggravated burglary (Count III), in violation of La.R.S. 14:42, La.R.S. 14:27, La.R.S. 14:30 and La.R.S. 14:60 respectively. He pled not guilty. After a jury trial, defendant was found guilty as charged. He was sentenced as follows: Count Ilife imprisonment at hard labor without benefit of parole, probation or suspension of sentence and with credit for time served; Count IIfifty years in the custody of the Department of Corrections with credit for time served, said sentence to run concurrently with the sentence in Count I; Count IIIthirty years in the custody of the Department of Corrections, said sentence to run concurrently with the sentences imposed in Counts I and II. Defendant appeals his convictions and sentences. He alleged sixty-six assignments of error.
Assignments of error numbers 1, 2, 6, 14, 15, 18, 22, 23, 29, 30, 37, 46, 48, 49, 50, 51, 64, 65 and 66 were not briefed and therefore are considered abandoned. Uniform Rules, Court of Appeal, Rule 2-12.4; State v. Trevathan, 432 So.2d 355 (La.App. 1st Cir.1983), writ denied, 437 So.2d 1141 (La.1983).
FACTS
At approximately mid-day on December 9, 1982, a young woman was in her home in Baton Rouge, Louisiana, when she opened her side door in response to a knock. She *1323 saw a black male, whom she recognized from an encounter about a month earlier. The man had previously come to her home looking for a Williams residence. On this particular day, however, the man stated he was collecting clothes for the needy. The woman became frightened and attempted to slowly close the door as they talked. The man shoved a flier through the opening and told the woman to read it. He then pushed the door open and forced his way into the house. The victim ran to the front door to escape, but it was locked. The intruder grabbed her, threw her to the floor and pinned her down while he removed a knife from a briefcase he was carrying. Holding the knife to her neck, he ordered the woman upstairs, forced her into a child's bedroom and told her to completely disrobe. The attacker removed his own clothing, raped her twice and attempted a third rape. During this incident, the woman was face to face with her attacker and observed his features. She also saw a scar in his shoulder area when he put his arms around her.
As the third attempt was beginning, Stephanie Alexander arrived to drop off the victim's young daughter. She honked her car horn to notify the victim that her daughter was home. When the victim did not come outside, Mrs. Alexander left her car with the motor running and knocked on the front door. When no one responded, she went around to the side door. Seeing that the door was open, she went inside and walked through the house, as she called out the victim's name. The assailant was holding his hand over the victim's mouth so she was unable to respond. About this time, he stabbed the victim in the stomach. He then pulled her toward the door, stabbed her again in the chest, and pushed the bedroom door closed from the inside.
Meanwhile, Mrs. Alexander proceeded upstairs with the children. She reached the top of the stairs and came face to face with the assailant. He grabbed her, pulled her into the bedroom and threw her against the bedroom wall. The children ran and hid. Mrs. Alexander begged the assailant to leave and offered her car for his escape. She covered her eyes and told the assailant that she would not look and could not describe him. At about this time, there was a knock at the door downstairs. It was later discovered that the postman was knocking in an attempt to deliver some certified mail. The assailant dressed and fled. The victim testified that she observed him wipe the bedroom door with his shirt before he left.
Subsequently, Mrs. Alexander drove the victim to a hospital where she underwent surgery for her injuries. Later that day Mrs. Alexander gave a description of the assailant which was used to make a composite drawing.
On December 15, 1982, while recuperating in the hospital, the victim gave a description of her attacker. Using an identikit, she made a composite drawing. This picture differed from the earlier drawing made from Mrs. Alexander's description. Later that day, the victim was shown eight photographic lineups, each consisting of six pictures of black males. No identification was made. The next day, December 16, the investigating officers, Detectives Groht and Mondrick, returned to show the victim three displays. Again no identification was made.
On January 3, 1983, while at her mother-in-law's home, the victim was shown six photographic lineups, each containing six photographs. At this session, the victim stated there was a person in one lineup who strongly resembled her attacker. She did not make a positive identification; rather, she requested side views of the suspects. Another lineup was composed using profiles; only Archie Williams' photograph was repeated. The victim pointed to Williams' picture and told officers to "look for someone who looked like him." She did not positively identify defendant at this time because she said his hair was different. The next day, January 4, the victim was shown one lineup. At that time, she positively identified defendant as her assailant. The January 4 photo lineup contained a photo of Williams with a different hair style. Later that evening, defendant was *1324 arrested. On January 5, 1983, a physical lineup was conducted. The victim again positively identified defendant as her attacker.
Mrs. Alexander also viewed the January 5 physical lineup. She identified another man, not defendant, as the assailant but testified that she had two choices but was told to only pick one.
At trial, the victim made an in-court identification of defendant. She also identified the scar on defendant's arm as the scar she noticed on the assailant's shoulder.
Defendant contended he was home asleep at the time of the crime. His mother testified she saw him asleep in her North Baton Rouge apartment at approximately 11:30 a.m., the approximate time of the offense. His sister and Albert Sterling both testified that defendant was home and asleep on the couch earlier that morning.
ARGUMENT NUMBER 1
(Assignments of error numbers 61, 62 and 63)
Defendant contends the trial court erred when it denied motions for new trial and a post-verdict judgment of acquittal and accepted a verdict contrary to the law and evidence. Specifically, he argues that the evidence was insufficient to support the convictions.
The trial judge may not reject the verdict of a jury that is correct as to form and meets procedural requirements. La. Const. art. I, § 17; La.C.Cr.P. arts. 809-820; State v. Coleman, 450 So.2d 1063 (La.App. 1st Cir.1984). Thus, the trial court did not err in accepting the jury's verdict of guilty on all three counts.
Secondly, defendant contends the trial court erred in denying his motion for new trial based upon insufficient evidence. Only the weight of the evidence can be reviewed by the trial court in a motion for new trial under La.C.Cr.P. art. 851. The trial court can grant a new trial only if it is dissatisfied with the weight of the evidence, and in so determining, that court makes a factual review as a thirteenth juror rather than under the sufficiency standard. State v. Korman, 439 So.2d 1099, 1101 (La.App. 1st Cir.1983). The trial court's determination of whether to grant or deny a motion for new trial on this basis is not subject to review by the appellate courts. La.Const. art. V, § 10; La.C.Cr.P. art. 858; See State v. Korman, 439 So.2d at 1101.
In Korman, we held that the proper procedural mechanism to raise the issue of the sufficiency of evidence is by a motion for a post-verdict judgment of acquittal under La.C.Cr.P. art. 821. Since such a motion was filed in this case, we will review the trial court's denial of this motion and address the sufficiency argument.
The standard established by La.C. Cr.P. art. 821 is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. State v. Walker, 447 So.2d 54 (La. App. 1st Cir.1984).
The evidence in this case was sufficient to prove that the crimes of aggravated rape, attempted first degree murder and aggravated burglary had been committed. Indeed, defendant in his rebuttal brief admits the crimes were successfully proven. The key issue is whether defendant was the person who committed the crimes.
In State v. Long, 408 So.2d 1221 (La. 1982), defendant's guilt was based entirely upon identification testimony, and the State presented no additional evidence. In regard to the standard to be used in determining if there was sufficient evidence to convict, the Louisiana Supreme Court stated that "it appears that the state was required to negate any reasonable probability of misidentification in order to carry its burden of proof." That court also stated that the trial court was faced with conflicting testimony and was required to determine which witnesses' testimony was more credible. The Supreme Court held that the misidentification of defendant as the perpetrator of another offense did not destroy *1325 nor even lessen the credibility of the identification testimony by the eyewitnesses.
Where the key issue is not whether the crimes have been committed, but whether the defendant was the person who committed them, the Supreme Court has continued to employ the Long standard. State v. Smith, 430 So.2d 31 (La.1983); State v. Brady, 414 So.2d 364 (La.1982). This court applied the same standard in State v. Thomas, 439 So.2d 629, 632 (La.App. 1st Cir.1983).
In this case, the jury was presented conflicting testimony on the identification of the perpetrator and was required to determine which witnesses' testimony was more credible. See Long, 408 So.2d 1221. Where there is conflicting testimony as to factual matters, credibility of witnesses is within the sound discretion of the trier of fact, Coleman, 450 So.2d 1063, and the appellate court will not reweigh credibility of witnesses when reviewing sufficiency of the evidence. State v. Jacobs, 435 So.2d 1014 (La.App. 1st Cir.1983).
After reviewing the record, we conclude that the jury did not abuse its discretion and that the State negated any reasonable probability of misidentification of defendant as the assailant.
Defense counsel essentially argues that since another eyewitness identified someone other than defendant, the victim's identification was unreliable and a misidentification. At trial, Mrs. Alexander testified that she was not absolutely certain about her identification when reviewing the physical lineups. She said, "When I went into the lineup, there were six men, all about the same height, all about the same body build, all with approximately the same hairdo, all approximately the same age. Uh, so I was left with the impression of, uh, eenie, meenie, miney, moejust picking one. It could be almost at random. The things that I remembered were all the same." She also testified that she had a first and second choice. Although she felt reasonably certain about her selection, she added she was only about 70% sure.
As discussed even more fully in succeeding arguments, we find that a reasonable trier of fact could find that the victim's identifications were reliable. She positively and forcefully identified defendant in an out-of-court photographic lineup and in a physical lineup. She also positively identified defendant at trial.
We note also that Mrs. Alexander viewed the assailant for a much shorter time period than the victim; she saw the man for approximately three minutes compared to the victim's ten to fifteen minutes. During much of the three minutes, Mrs. Alexander had her eyes covered and was only looking at the assailant's feet to make sure where he was in the room. She said that she peeped out at him when she felt he was not looking and probably glanced at him twice. In addition, the victim recalled seeing this man about a month earlier when he was looking for the "Williams" residence.
Also, during the incident the victim noticed a scar on the assailant's upper body when he put his arms around her. Initially, she stated the scar was on his right clavicle but at trial stated the scar was on his right upper arm. Mrs. Alexander did not recall a scar. Defendant does have a scar on his upper right arm. At trial the victim identified defendant's upper arm scar as the one she saw during the attack. We find no significance in the victim's inability to pinpoint the precise location of the scar.
Jerry Miller, serologist from the State crime lab, testified that he could not absolutely say that the seminal fluid detected in the victim's vaginal washings was deposited by defendant. He did say, however, that tests could be conducted to exclude certain persons. From the tests conducted in this case, the results did not exclude the possibility that defendant was the rapist.
Defendant also argues that the lack of any other evidence proves his innocence. He argues that there is no other testimony or physical evidence linking him to this incident. He contends that the lack of medical, scientific, physical or fingerprint evidence exonerates him. Specifically, he *1326 argues that although the standard "rape kit" procedure was used, no evidence was discovered linking him to the crime.[1] He also notes the lack of fingerprints identified as his and the presence of unidentified fingerprints.[2] Those unknown fingerprints, he submits, belonged to the assailant and prove him innocent. Defendant also argues that the alibi testimony at trial further proves he was at home asleep at the time of the offense and that it was impossible for him to be the assailant.
The burden is not upon defendant to prove his innocence, but upon the State to prove defendant's guilt beyond a reasonable doubt. La.R.S. 15:271. Positive identification by only one witness is sufficient evidence to support the jury's conviction of defendant. Coleman, 450 So.2d 1063.[3]
After reviewing the entire record, we are convinced that the State negated any reasonable probability of misidentification. Before and during the trial, the victim identified defendant as the assailant. Moreover, the jury apparently chose to give more weight to the victim's testimony and identifications than to Mrs. Alexander's out-of-court identification and the testimony of defendant's alibi witnesses. We conclude, therefore, that this jury when viewing the evidence in the light most favorable to the prosecution could find beyond a reasonable doubt that defendant committed the offenses in question.
These assignments of error lack merit.
ARGUMENT NUMBER 2
(Assignments of error numbers 2, 3 and 4)
Defendant contends the trial court erred when it sustained the State's objection to defense counsel's questions regarding the informant's credibility. He argues that the questions were asked to ascertain the informant's identity, which he is entitled to know. He says that the State's failure to disclose this information violated his right to prepare his defense.
During the hearing on February 23, 1983, on the consolidated pretrial motions, Officer Woodring revealed that an informant told the police he could identify the assailant in this case. The man, who was a convicted criminal, had not previously been a police informant. Officers showed the identikit composite drawing by the victim to some convicted criminals, including the informant. Several days later on January 3, 1983, this man informed the police that the suspect was Archie Williams. Based on this information, a photograph of defendant was obtained and placed in the lineups shown to the victim. Subsequently, the victim positively identified defendant in a photo lineup. Defendant was arrested, pursuant to an arrest warrant based upon the victim's identification. The trial court would not allow defense questions that it believed were asked to obtain the informant's identity and were irrelevant.
The informer privilege is the privilege of withholding the identity of an informant who supplies information concerning crime to law enforcement officials. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); State v. Dotson, 260 La.471, 256 So.2d 594, 606 (1971), (on rehearing), cert. denied, 409 U.S. 913, 93 S.Ct. 242, 34 L.Ed.2d 173 (1972). This is a privilege founded on public policy and seeks to advance the public interest in effective law enforcement by encouraging persons to supply information to the police without fear of reprisal by the person to whom the information pertains. Roviaro, 77 S.Ct. at 627; State v. James, 396 So.2d 1281, 1284 (La.1981); Dotson, *1327 256 So.2d at 607. The identity of an informant should be made known to the accused only when a defendant's right to prepare his defense outweighs the need for protection of the flow of information. James, 396 So.2d at 1284.
The Louisiana Supreme Court in Dotson adopted a strict Roviaro balancing test. In Roviaro, the United States Supreme Court stated that there is no fixed rule with respect to disclosure. The court explained:
The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.
Roviaro v. United States, 77 S.Ct. 627, 628.
To gain disclosure, defendant bears the burden of demonstrating exceptional circumstances pertaining to his defense; and the trial court is accorded great discretion in making such a determination. State v. Davis, 411 So.2d 434, 437 (La. 1982). In the instant case, we find that the trial court did not abuse its discretion in refusing to order disclosure of the informant's identity and in not allowing questions which would elicit this information. Defendant simply has not demonstrated exceptional circumstances which would warrant disclosure. He merely makes bare allegations that the identity of the informant, whom he believes is Henry Sanford, is necessary to prepare his defense. Defendant apparently contends that Mr. Sanford has a similar physical description to his own and that Mr. Sanford was the actual assailant in this case. Despite defendant's speculations, there is no showing that the informant was the actual perpetrator. Nor is there any showing that the informant played any role in the crimes.
In State v. Davis, the Louisiana Supreme Court stated:

Roviaro and the cases which follow it have given us certain outlines in which to operate. At one end of the spectrum is the `mere tipster' cases. It is well settled that the Roviaro principle does not require disclosure and production of such an informant. At the other end of the spectrum are other cases such as Roviaro, itself, in which the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to insure a fair trial. Additionally, the burden of proving why he needs to know the identity of the confidential informant is placed on defendant. In other words, the defendant must convince the court that the informant may be able to give testimony which is necessary to a fair determination of the issue of guilt or innocence.
411 So.2d at 437.
Here, the informant did no more than identify a drawing of the suspect in the case. His action is analogous to the "mere tipster" cases in which an informant does no more than furnish a tip that enables police to make an arrest. Thus, defendant has not shown exceptional circumstances that warrant disclosure.
Furthermore, in light of defendant's suspicion of the informant's identity, we find no violation of his right to prepare a defense. The trial court in ruling on the motion for new trial stated:
There's no evidence before the court, and I cannot make a determination that Mr. Sanford was in fact the confidential informant. I will state for the record that Mr. Sanford was in fact tried the same exact week that was triedthat Archie Williams was tried in this particular section in Judge Higginbotham's section. He was convicted of a rape which occurred in the same general time frame that this crime had occurred. That was of public record. Mr. Sanford was in fact viewed by the court himself walking back and forth behind the courtroom a number of times during the course of the trial of Archie Williams, and if any suspicions *1328 by the defense counsel in this matter Mr. Sanford may be have been the actual perpetrator in this particular matter, it would have been availableobviously available to this defense at that particular time. Apparently, pursuant to the stipulation by Mr. Hollingsworth and agreed to by defense counsel, Mr. Sanford's fingerprints were [compared] to those two unidentified fingerprints that was introduced into evidence at this trial, and they did not match up. So, in any event, Mr. Sanford was considered by some to be a suspect in this particular matter, and I think that would have been easily obtainable by the defense counsel using due diligence by the defendant, and this evidence would have been available to the defendant at the time of the trial herein.
We agree with the trial court that the State's refusal to admit that Mr. Sanford was the informant did not deny defendant his right to prepare his defense.
Moreover, we also agree with the trial judge that evidence of the confidential informant, even if he were Henry Sanford, would not have changed the verdict. The trial court did not abuse its discretion by not allowing questions regarding the informant's identity. Nor was there any prejudice to defendant by the failure to disclose the informant's identity. La.C.Cr.P. art. 921.
These assignments of error lack merit.
ARGUMENT NUMBER 3
(Assignment of error number 7)
In this assignment of error, defendant argues that the trial court erred in denying his motion for recess. Prior to trial, a consolidated hearing was held on several pretrial motions.[4] At this hearing, the trial court denied defendant's motions for recess in order to allow additional testimony by Mrs. Alexander, who was not present. Defendant argued that prior to this hearing he did not know the name and address of the witness who composed the police drawing of the suspect. Defense counsel also requested through the motion for cooperation, that the State subpoena the victim and witness for the hearing on the motion to suppress. Defendant argues that the testimony of Mrs. Alexander was necessary on the motion to suppress to show the likelihood of misidentification of defendant by the victim in the photo and physical lineups.
Although defendant does not have a right to the names and addresses of State witnesses, the discovery of this information is not prohibited where there has been a determination that there exist peculiar and distinctive reasons why fundamental fairness dictates discovery. See La.C. Cr.P. art. 723; State v. Washington, 411 So.2d 451 (La.1982); State v. Walters, 408 So.2d 1337 (La.1982). Furthermore, rulings of the trial judge in pretrial matters are generally shown great deference absent a clear showing of abuse of discretion. State v. Stucke, 419 So.2d 939, 948 (La. 1982).
In his brief, defendant contends that "because the State failed to provide this information subsequent to the filing of a defense `motion to cooperate/alternatively for the state to declare its intentions to this file,' an order to compel discovery and recess to efficiently act upon the information requested, developed as a legal right." He also contends the denial of the motion for recess based on the State's refusal to answer discovery violated his right to prepare a defense and argue pretrial motions.
Defendant has not made a showing as to how the lack of Mrs. Alexander's testimony violated his statutory or constitutional right to fundamental fairness. While her *1329 testimony regarding the identification may have been in conflict with the victim's testimony, this evidence concerns the weight to be given the identification, not its admissibility.
The decision as to whether to grant a recess is within the sound discretion of the trial court and will not be reversed in the absence of a showing of abuse. State v. Mack, 435 So.2d 557 (La. App. 1st Cir.1983), writ denied, 440 So.2d 727 (La.1983). In light of defendant's failure to show how he was prejudiced by the denial of the motion for recess, we find no abuse of the trial court's discretion.
This assignment of error lacks merit.
ARGUMENT NUMBER 4
(Assignments of error nos. 8, 10, 11, 12, 13, 16 and 17)
Defendant contends that the trial court erred in refusing to compel production of taped statements of the victim and eyewitness and in ruling that the State complied with defendant's motions for discovery and Brady motion.
Taped statements were given by the victim and her friend who also saw the assailant. Included in each statement were descriptions of the intruder. Defendant sought production of both tapes, contending that the tapes contained exculpatory material. Defense counsel argues that since identity was a key issue and there are discrepancies in the descriptions of the assailant, the evidence is favorable to defendant and relevant to his guilt or innocence. The State contends that the victim's statement did not differ substantially from her subsequent descriptions. It also contends that Mrs. Alexander's statement, like the victim's, was neither exculpatory nor material.
Defendant's Brady motion contains a specific request for evidence of any statement made by a witness which varies in any manner from statements of other witnesses. He requested a copy of the statement of each witness. In addition, his motion stated, "If any description given by a witness varied in any manner from descriptions given by other witnesses or from the object described the defendant requests the full statements of the witnesses and all information regarding the inconsistencies."
The State did not provide defendant with the recorded statements. At the motion to suppress hearing, defense counsel orally requested a copy of the victim's taped statement after learning of its existence. The State refused to provide the evidence unless the trial court made an in camera examination. The trial court agreed to inspect the tapes. On March 7, 1983, the trial court ruled that the victim's statement did not contain Brady material.
Subsequently, defendant learned that the State also had possession of a taped statement in which Mrs. Alexander described the victim's assailant. On March 8, 1983, in open court defense counsel requested this statement. The trial court agreed to make an in camera examination of this statement and to re-examine the victim's taped statement.
Prior to trial on March 21, 1983, the trial court ruled that, although the taped statements contained some minor inconsistencies in the descriptions by both women, neither tape contained Brady material. The trial court agreed to put a copy of these tapes into the record for appeal.
Subsequently, defendant applied for writs to this court to review the correctness of the trial court's ruling. This court in State v. Williams, (La.App. 1st Cir.1983) (Docket No. 83KW0384, decided April 11, 1983), denied writs and noted that defendant had an adequate remedy by appeal. However, in the interest of judicial expediency we examined the taped statements in camera and found that the trial court's ruling was correct.
The general rule set forth in our criminal discovery articles, specifically La. C.Cr.P. art. 723, is that the prosecution is not required to furnish statements by witnesses or prospective witnesses, other than the defendant, made to the district attorney or to agents of the State. One exception to that rule, of concern in the instant case, is *1330 that an exculpatory statement must be furnished defendant on request even though made by a witness other than defendant. La.C.Cr.P. art. 718(1); State v. Landry, 381 So.2d 462, 465 (La.1980).
Furthermore, the right to be protected against the prosecution's failure to reveal its possession of exculpatory evidence is founded upon the due process clause and is designed to assure a fair trial. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court established categories of evidence to which the Brady rules apply and set forth standards of review in conjunction with these categories.
The request in the present case is a specific request, like the request in Brady, for statements made by persons other than defendant. In Agurs, the United States Supreme Court stated in regard to a pretrial request for specific evidence:
Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."
Agurs, 96 S.Ct. at 2399.
In State v. Sylvester, 388 So.2d 1155, 1161 (La.1980), a specific request was made prior to trial for statements tending to reduce the credibility of a prosecution witness. After the request was renewed at trial, the prosecution admitted it had possession of a statement by a particular witness but denied the statement was inconsistent with the witness' trial testimony. The trial court conducted an in camera inspection and found that defendant was not entitled to production. The Louisiana Supreme Court held that the materiality standard to be applied in such cases is "whether the omitted evidence, when considered in the context of the entire record, creates a reasonable doubt that did not otherwise exist.[5] That standard was applied because (1) the prosecution had responded to a request for specific evidence by submitting that evidence for in camera examination and (2) the evidence was exculpatory in nature because it was possibly inconsistent with trial testimony, but not because standing alone, it tended to establish innocence. State v. Sylvester, 388 So.2d at 1161.
In this case, the statements, like the statement in Sylvester, are not inherently exculpatory, nor are they inconsistent with the witness' testimony. As noted earlier, the trial court found the taped statements to contain only minor inconsistencies which did not constitute Brady material. Moreover, when considered in the context of the entire record, the statements do not create a reasonable doubt that did not otherwise exist.[6] Our review of the record indicates that the jury was aware of the discrepancies in the descriptions and Mrs. Alexander's positive identification of someone other than defendant.
*1331 Thus, applying the above standard, we find that there was no error in the trial court's denial of defendant's request for production of the taped statements.
These assignments of error are without merit.
ARGUMENT NUMBER 5 AND ARGUMENT NUMBER 10
(Assignments of error numbers 19, 21, 24, 27, 31, 33, 34, 35, 38, 39, 40, 41, 43 and 45)
Defendant urges that the trial court erred in overruling his objections to the State's exercise of peremptory challenges and in denying a motion for mistrial which was based on the State's use of peremptory challenges. Defendant argues that the State used its peremptory challenges to systematically exclude blacks from the jury which violates equal protection, the Sixth Amendment right to an impartial jury and the right to a fair trial under Article I, § 16 of the Louisiana Constitution.
The record does not reflect the race of the prospective jurors. In his brief, defendant argues that all thirteen[7] of the State's peremptory challenges were exercised against black prospective jurors. During argument on the motion, the prosecutor asked the trial judge to take judicial notice that there were three blacks on the jury. He also noted that the defense used one of its peremptory challenges to exclude a black juror. The trial court, in denying the motion, stated that at least two black jurors of the three black jurors were accepted while the State had available peremptory challenges. Defendant does not dispute these facts.
EQUAL PROTECTION
A defendant is not denied equal protection when the State exercises its peremptory challenges to exclude black persons in a particular case unless there has been a systematic exclusion over a period of time. The defendant must establish a prima facie showing of such systematic exclusion before the State is required to show the exercise of its peremptory challenges was not discriminatory. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); State v. Brown, 371 So.2d 751 (La.1979).
Defendant has not met this burden. He merely states that all of the State's peremptory challenges were used to exclude blacks. Defendant has not shown a pattern of systematic exclusion of blacks nor shown that the use of the peremptory challenges was racially motivated. Furthermore, we find defendant's argument difficult to accept in light of the fact that two black jurors were accepted while the State had peremptory challenges available.[8]
SIXTH AMENDMENT RIGHT
Defendant also argues that the State's use of peremptory challenges violates his Sixth Amendment right to be tried by an impartial jury from a fair cross-section of the community. Specifically, he argues that the jury not merely the venire, must be representative of the community.
The Sixth Amendment guarantees a criminal defendant the right to an impartial jury selected from a group representing a fair cross-section of the community. Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).
In Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the United States Supreme Court held that Missouri law exempting women from jury service and resulting in the underrepresentation of women on jury venires violated the fair *1332 cross-section requirement of the Sixth Amendment. The court stated the test as follows:
In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
99 S.Ct. at 668. (Emphasis added.)
Defendant has failed to demonstrate any violation of this Sixth Amendment right. He does not contend the jury venire failed to represent a fair cross-section of the community. In fact, in stating that the State used all its peremptory challenges on black prospective jurors, he admits the venire contained a number of blacks.
In regard to defendant's argument that the State deprived him of his right by excluding blacks from the petit jury, we note that United States Supreme Court cases have only applied this Sixth Amendment right to jury venires, panels or pools and have not extended it to petit juries.[9] The court in Taylor v. Louisiana specifically held a criminal defendant is not entitled to a jury of any particular composition and that the petit jury need not mirror the community nor reflect the various distinctive groups in the population.
ARTICLE I, § 17 OF THE LOUISIANA CONSTITUTION
Defendant also argues that since his right to peremptory challenges is constitutionally guaranteed by Louisiana Constitution article I, § 17, it prevails over the State's right to use peremptory challenges found at La.C.Cr.P. art. 799, which is statutory in origin.
In State v. Sharp, 174 La.860, 141 So. 859 (1932), the Louisiana Supreme Court found then La.R.S. 15:354, authorizing peremptory challenges by the State, constitutional despite the failure of our Constitution of 1921 to expressly address the State's right to challenge jurors peremptorily.[10] The State Constitution, then as now, merely safeguards the accused's right to peremptorily challenge as many prospective jurors as may be fixed by legislative enactment. Article 799 is neither in conflict with nor an infringement on the grant of Louisiana Constitution article I, § 17.
Thus, we conclude that the State's use of peremptory challenges did not violate any of defendant's constitutional rights. Additionally, the trial court did not err in denying defendant's motion for mistrial on this basis.
These assignments of error are without merit.
ARGUMENT NUMBER 6
(Assignment of error number 9)
Defendant contends that the trial court erred in denying his motion to suppress the physical and photographic lineup identifications. He argues that the photographic lineup procedure was suggestive and that the out-of-court identifications were unreliable.
The validity of an identification procedure depends upon whether, judging from the totality of the circumstances, the procedure was so unnecessarily conducive to irreparable mistaken identification as to deny the accused due process of law. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. *1333 Lindsey, 404 So.2d 466, 473 (La.1981), remanded an other grounds, 428 So.2d 420 (La.1983). A lineup is unduly suggestive if the identification procedure displays the defendant so that the witness' attention is focused on the defendant. State v. Robinson, 386 So.2d 1374 (La.1980); State v. Dryer, 449 So.2d 620 (La.App. 1st Cir. 1984).
Specifically, defendant contends that the photo lineup procedure was suggestive "because (1) the repeated lineups changed all pictures but the defendant's, (2) the police added personnel for the viewing of the lineups which included defendant's picture, (3) the police added William's (sic) picture based on an uncorroborated tip from an unreliable informant, (4) the officer called the police station for immediate delivery of side views of the defendant and five new faces; and (5) there was adequate time for the police to take greater care in creating each photo array."
Between December 15, 1982, and January 4, 1983, the victim was shown approximately eighteen photographic lineups. These lineups conformed to a usual photo display arrangement, i.e., cut out "bust" black and white photos of suspects pasted on a manilla folder. Most of the lineups contained numbers under the photographs.
While recuperating in the hospital, the victim gave police a description of her attacker; and a composite picture was made using an identikit. Later that same day, the victim was shown eight photographic lineups, each consisting of six pictures of black males.
The lineups did not contain defendant's picture and no identification was made. The next day, December 16, 1982, three displays were shown to the victim. Again, these displays did not contain defendant's picture and no identification was made. On January 3, 1983, a convict who viewed the victim's composite drawing informed the police that the suspect was Archie Williams. Based on this information, a photograph of defendant was obtained. Later that day, the victim was shown six lineups. One of the lineups included defendant's photograph. At this session the victim stated there was a man in the lineup who strongly resembled her attacker, and she requested side views of the suspects. The officers called the police station for more photographs and about forty-five minutes later the victim was shown another photo lineup containing profiles; only defendant's picture was repeated. When viewing this lineup the victim pointed to defendant's picture and told officers to "look for someone who looked like him." She did not make a positive identification because of the difference in the hair of her assailant and that of the man in the photograph. On January 4, 1983, the victim was shown only one lineup and at that time she positively identified defendant. Defendant's picture in this lineup had a different hairstyle.
Although defendant's picture was the only one repeated in the side view photos and the January 4 lineup, we find nothing in the procedure which singled him out. After reviewing all the lineups, especially the last three lineups, we find nothing in either the photographs or procedure that was suggestive.[11]
Furthermore, we do not follow defendant's reasoning that the procedure was suggestive because his picture was added to the lineups based on an uncorroborated tip from an unreliable informant. As long as the victim was unaware of those facts, no suggestiveness was involved. Without knowledge of the "source" of any particular photograph, the victim could not have been influenced in her identification.
Finally, we conclude that care was taken in the creation of each photo array. The lineups contained photographs of black men with similar physical characteristics. After reviewing all the lineups, we cannot say that defendant was displayed in such a way that a witness' attention was focused *1334 on him. To the contrary, the record indicates that the officers were careful not to suggest to the victim which man she should identify. In fact, they repeatedly told her not to identify a suspect until she was positive. Defendant has not met his burden of proving the suggestiveness of the out-of-court identifications. La.C.Cr.P. art. 703(D); State v. Vaughn, 378 So.2d 905, 909 (La.1979). The record simply does not support defendant's contention that the lineups were suggestive.
Even if an identification is suggestive, it will not result in reversal of a conviction if it is demonstrated that the identification was reliable. Manson v. Brathwaite, 97 S.Ct. at 2249; Dryer, 449 So.2d 620.
Defendant contends that the victim's identifications (from the photo and physical lineups) were unreliable because she gave inconsistent descriptions. He contends the description she gave while in the hospital during her taped statement was different from the description at the Brady hearing. In addition, he claims the inconsistencies in the physical lineup identifications between the victim and Mrs. Alexander render the victim's identification unreliable.
The factors to be used in determining reliability include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of her prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Manson v. Brathwaite, 97 S.Ct. at 2253; Dryer, 449 So.2d 620.
Applying the Manson analysis to the present case, we find that the victim's identifications were reliable.
(1) The opportunity to view. The victim testified at trial[12] that the incident lasted approximately ten to fifteen minutes. She was face to face with the man almost the entire time and was close enough to view his facial features and notice a scar on his upper body. Mrs. Alexander viewed the attacker for only a few minutes and, with the exception of her initial encounter, was never near the man.
(2) The witness' degree of attention. In order to later make a good composite drawing, the victim made a conscious effort to look at the rapist during the incident.
(3) The accuracy of the description. The victim's initial description was used, with the help of an identikit, to create a composite picture of the attacker. After seeing the victim's composite, an informant identified the suspect as defendant. Additionally, after reviewing the victim's composite picture, we do find that it resembles defendant.[13]
(4) The witness' level of certainty. A review of the record indicates that the victim never wavered in her identification. In fact, she was shown approximately eighteen photo lineups, each containing six photos, and did not state any suspect resembled her attacker until she saw defendant's picture. Moreover, the victim testified she wanted to be positive before she made an identification. We also note that the victim saw her attacker at her home about a month earlier when he supposedly was looking for a "Williams" residence.[14] On the day of the rape when she saw the man outside she immediately recognized him as the same person. When identifying defendant, *1335 she was certain that he was the same man whom she had seen prior to the rape.
(5) The time between the crime and the confrontation. The victim gave a description of her attacker a few days after the incident. During the next three weeks she was shown numerous lineups. The photo and physical lineup identifications occurred less than a month after the attack. In light of that short time period, there is no likelihood that the victim forgot her attacker's physical characteristics and features.
Thus, after reviewing under the Manson analysis the totality of the circumstances, especially the above mentioned factors, we conclude the victim's identification was reliable and that there was no likelihood of misidentification.
We do not agree that the differences in the victim's and witness' composite drawings and identifications render the victim's identification unreliable. We think that this argument addresses itself to the weight of the evidence. The weight to be given a witness' testimony is an issue which must be determined by the finder of fact. State v. Wright, 410 So.2d 1092 (La. 1982).
Thus, we conclude that the trial court did not err in denying the motion to suppress the physical lineup and photographic lineup identifications. This assignment of error is without merit.
ARGUMENT NUMBER 7
(Assignments of error numbers 20, 26, 28, 32, 36 and 42)
Defendant alleges the trial court erred in denying his challenges for cause of six prospective jurors.
Both the Federal and State Constitutions provide that a defendant in a criminal prosecution has a right to a trial by an impartial jury. U.S. Const.Amend. VI; La. Const. Art. I, § 16; State v. Domino, 444 So.2d 268, 270 (La.App. 1st Cir.1983).
La.C.Cr.P. art. 797 provides in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
. . . . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
. . . . .
(4) The juror will not accept the law as given to him by the court....
The trial court should sustain a challenge for cause despite a prospective juror's professed impartiality if his answers reveal facts from which bias, prejudice or inability to follow the law may be reasonably implied. State v. Albert, 414 So.2d 680 (La.1982); State v. Glaze, 439 So.2d 605 (La.App. 1st Cir.1983). In order to prove reversible error, the defendant must show: (1) that the trial court erred in refusing a challenge for cause made by him; and (2) that he exhausted all his peremptory challenges. La.C.Cr.P. art. 800.[15] The trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will not be disturbed on appeal absent a showing of abuse of discretion. Glaze, 439 So.2d 605. In evaluating the fairness of a trial court ruling on voir dire, the entire examination must be considered. State v. Jackson, 439 So.2d 622 (La.App. 1st Cir.1983), amended on other grounds, 452 So.2d 682 (La.1984).
Having exhausted all of his peremptory challenges before completion of the panel, defendant is entitled to complain on appeal *1336 of the trial judge's ruling which denied his challenges for cause of prospective jurors, Nancy Talbot, Edward Gaines, Marjorie Mims, Janet Lupo, Linda Leglue and Ronnie Pierce.
NANCY TALBOT, JANET LUPO AND RONNIE PIERCE
These prospective jurors expressed some reservations about their ability to fairly consider defendant's right not to testify as guaranteed by the Fifth Amendment to the United States Constitution. Initially, when questioned by defense counsel, Mrs. Talbot stated she would have to "hear both sides" and would "hold it against defendant" if he did not testify. At this point the trial judge intervened and explained defendant's constitutional right not to testify. When defense counsel resumed questioning, Mrs. Talbot stated she would not say defendant was guilty if he failed to testify. When the trial court refused to excuse her for cause, defense counsel used a peremptory challenge to prevent her from being sworn as a juror.
Janet Lupo also initially stated she would "hold it against defendant" if he did not testify and prove himself innocent. Both the trial court and the prosecutor carefully explained the presumption of innocence and the privilege against self-incrimination. Mrs. Lupo stated she would try her best to apply the law and would not convict defendant because he did not take the stand. Defense counsel also peremptorily challenged Mrs. Lupo when the trial court refused to excuse her for cause.
Ronnie Pierce, another prospective juror, stated he could not promise he would be totally fair if defendant did not testify in his own behalf. He also indicated he had been excused for cause in a criminal case the day before due to his feelings about the Fifth Amendment privilege. After explanation by the court and State, Mr. Pierce indicated in further questioning that he would accept his duty not to allow defendant's silence to affect his verdict. Having previously exhausted all of his peremptory challenges, defendant was unable to prevent Mr. Pierce from being sworn as a juror.
It is not error for the trial court not to dismiss a juror who expresses some reservation about accepting the law when, after additional questioning by the trial court and the State, the juror assures the trial court that he could apply the applicable law and give defendant a fair trial. Jackson, 439 So.2d 622.
The determination of the qualifications of a juror is within the sound discretion of the trial judge. Only when his exercise of such discretion is arbitrary or unreasonable, to the prejudicial injury of the defendant in obtaining a fair and impartial trial, will an appellate court be warranted in setting aside a verdict. State v. Johnson, 324 So.2d 349 (La.1975).
After reviewing the entire voir dire examination of Mrs. Talbot, Mrs. Lupo and Mr. Pierce, we conclude that each was adequately rehabilitated. Mr. Pierce said: "If I think there is a major flaw in your [the State's] case ... I would find in his [defendant's] favor ... whether he took it [the stand] or not." Mrs. Lupo said if she had a reasonable doubt in her mind she would not convict if defendant failed to take the stand but would wonder why he did not. After further questioning, she assured the court she would not convict simply because he did not take the stand. Mrs. Talbot assured the court she would not hold it against defendant if he chose not to testify after the law was explained to her.
EDWARD GAINES
Defendant argues that Edward Gaines, a prospective juror, was biased due to his employment in the criminal division of the East Baton Rouge Parish Clerk of Court's office. When the trial judge refused to excuse him for cause, defense counsel used a peremptory challenge to excuse Mr. Gaines. After reviewing this prospective witness' entire voir dire examination, we cannot say that the trial court erred in denying a challenge for cause. We do not agree with defendant that Mr. Gaines' answers *1337 reveal facts from which bias could reasonably be implied. Moreover, defendant was afforded wide latitude in the examination of Mr. Gaines. He did not, however, show that this prospective juror was biased.
MARJORIE MIMS AND LINDA LEGLUE
Defendant contends the trial court should have allowed his challenge for cause of Marjorie Mims and Linda Leglue. He argues that knowledge of the facts of the case affected their impartiality as jurors. Both individuals were peremptorily excused by defendant. The trial court in denying the challenges for cause, stated that Mrs. Mims recalled only vague information about the case and that she would accept the oath to apply the law. He stated that Mrs. Leglue would be impartial and found her to be acceptable after applying the standard in State v. Goodson, 412 So.2d 1077 (La.1982).
It is well settled that the mere fact that a prospective juror has knowledge of facts surrounding the occurrence of the offense does not necessarily make him subject to a challenge for cause. State v. Sonnier, 379 So.2d 1336 (La.1979), cert. denied, ___ U.S. ___, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). Furthermore, in Goodson, the Louisiana Supreme Court vacated the trial court's ruling on a motion for change of venue and instructed that court to defer ruling on the motion until completion of voir dire. The court stated:
Both the degree of exposure and the prospective juror's testimony as to state of mind are relevant to the determination of acceptability. A prospective juror testifying to an inability to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror remembers information that will be developed in the course of the trial, or that may be inadmissible but does not create a substantial risk of impairing judgment, that person's acceptability shall turn on the credibility of testimony as to impartiality. If the formation of an opinion is admitted, the prospective juror shall be subject to challenge for cause unless the examination shows unequivocally the capacity to be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.
State v. Goodson, 412 So.2d at 1081.
After reviewing the entire voir dire examination of Mrs. Mims and Mrs. Leglue, we find that the trial court did not abuse its discretion in denying these challenges for cause. Although Mrs. Leglue remembered some facts, her testimony does not reveal either that she had formed an opinion as to this particular defendant or that she had preconceptions regarding this case. Furthermore, she was not exposed to reports of highly significant information or substantial amounts of inflammatory material.
In light of Mrs. Mims' examination, we disagree with defendant that the trial court erred in denying a challenge for cause as to this prospective juror. Mrs. Mims' slight knowledge of the facts did not affect her impartiality. Defendant contends she should have been excused because of her difficulty in judging a case involving a black defendant and white victim. He also contends this prospective juror could not accept defendant's right not to testify and that no attempt was made to rehabilitate the witness regarding these matters. Mrs. Mims was questioned by the prosecutor and we find she was rehabilitated and that her answers were sufficient to indicate her impartiality.
Since the defendant has failed to show that the trial court erred in denying any of his challenges for cause, we find no reversible error in these assignments.
ARGUMENT NUMBER 8
(Assignment of Error Number 25)
Defendant contends that the trial court erred when it sustained the State's objection *1338 to his voir dire questions, thus limiting his right to full examination of prospective jurors.
One prospect, Edward Gaines, was an employee of H.M. "Mike" Cannon, Clerk of Court for the Nineteenth Judicial District Court, and had previously worked in the criminal records department of the clerk's office. Initially, Mr. Gaines was asked numerous questions regarding his prior knowledge of the facts of this case. During voir dire, the defense attempted to inquire about Gaines' knowledge of the publicity regarding a controversy between Cannon and the East Baton Rouge Parish District Attorney Ossie Brown involving defendant and his early release from prison.[16]
The trial judge sustained the State's first objection to questions regarding the Clerk of Court's quotes published in the local newspaper. A few moments later the prosecutor again objected when the defense counsel asked if Mr. Gaines was aware of any publicity involving "Mike" Cannon. This time the trial judge ruled that the defense would be allowed, because of the witness' employment, to question him regarding the controversy reported in the newspapers. The defense was admonished, however, not to refer to direct quotes. The questioning resumed. Counsel generally questioned the prospective juror regarding publicity involving Cannon and publicity regarding "criminal records" but did not specifically mention the publicity surrounding this case.
Article I, § 17 of the Louisiana Constitution provides that "[t]he accused shall have a right to full voir dire examination of prospective jurors...." La.C. Cr.P. art. 786 provides that the court, State and the defendant shall have the right to examine prospective jurors and that the scope of examination shall be within the discretion of the court. The purpose of voir dire examination is to determine qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges. State v. Perry, 420 So.2d 139 (La. 1982), cert. denied, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). Although counsel must be afforded wide latitude in conducting voir dire, the scope of the examination is within the sound discretion of the trial judge and his rulings will not be disturbed on appeal in absence of a clear abuse of this discretion. Furthermore, in making such an evaluation, the entire voir dire examination must be considered. State v. Marchese, 430 So.2d 1303 (La.App. 1st Cir.1983).
After reviewing the voir dire examination of Gaines, we find no abuse of discretion on the part of the trial judge. That review indicates that the trial judge did allow questions regarding the publicity of this case. We also notice that the voir dire examination was expanded to allow questions related to the change of venue motion. In light of the total examination, we conclude the failure to allow the defense to ask questions about newspaper quotes from the juror's employer did not hinder him from obtaining information related to this juror's competency and impartiality. The trial court's ruling was not error, and this assignment is without merit.
ARGUMENT NUMBER 9
(Assignment of Error Number 44)
Defendant contends he was denied a fair trial because the trial court did not grant his pretrial motion for change of venue.
*1339 The right to jury trial guarantees to the defendant a fair trial by a panel of impartial, indifferent jurors. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Qualified jurors, however, need not be totally ignorant of the facts and issue involved. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Irvin, 81 S.Ct. at 1642.
At the same time the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to defendant to demonstrate the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality. Murphy, 95 S.Ct. at 2036; State v. Goodson, 412 So.2d 1077, 1080 (La.1982).
The Louisiana Supreme Court has stressed that there is a difference between answers which would sustain a challenge for cause and those which indicate the need for a change of venue. State v. Clark, 442 So.2d 1129 (La.1983). Furthermore, the Louisiana legislature, in adopting the specific provision providing for a change of venue, La.C.Cr.P. art. 622, clearly intended that grounds for challenge of jurors for cause and grounds for a change of venue be separate and different concepts. State v. Bell, 315 So.2d 307, 309 (La.1975).
The grounds for a change of venue are set forth in La.C.Cr.P. art. 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue that court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
Some relevant factors in determing whether to change venue include: the nature of pretrial publicity and the particular degree to which it has circulated in the community; the connection of government officials with the release of the publicity; the length of time between the dissemination of the publicity and the trial; the severity and notoriety of the offense; the area from which the jury is to be drawn; other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; the degree to which publicity has circulated in areas to which venue could be changed; the care exercised and ease encountered in selecting a jury; the jurors' familiarity with publicity and its resultant effects; the peremptory challenges for cause exercised by defendant; and any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Bell, 315 So.2d at 311; State v. Rodrigue, 441 So.2d 1274 (La.App. 1st Cir. 1983), writ denied, 445 So.2d 436 (La.1984).
The offenses charged in this case occurred on December 9, 1982. Defendant was arrested on January 4, 1983. His pretrial motion for change of venue was filed on January 28, 1983. The trial court deferred the ruling on this motion until after the voir dire was completed. In denying the motion, the trial judge addressed some of the relevant factors, especially those factors concerning the prospective jurors and voir dire examination. In our review, we will also address the relevant factors to determine if a change of venue was required.
NATURE AND DEGREE OF PRETRIAL PUBLICITY
From December 10, 1982 (the day after the offense), until January 7, 1983 (a few days after defendant's arrest), there were *1340 approximately twelve (12) newspaper articles and two editorials concerning this incident. From January 13, 1983, until January 26, 1983, there were approximately eleven (11) more articles, including an editorial and letters to the editor. After his arrest, defendant's picture was published in the newspapers no less than three times.[17] Various Baton Rouge radio and television stations covered the story. Furthermore, in an attempt to obtain leads on a suspect, this incident was re-enacted by a local television news public service called "Crime Stoppers." While we agree that the news coverage of this case was extensive, we do not find it so pervasive that it prejudiced defendant's right to a fair trial.
CONNECTION OF GOVERNMENT OFFICIALS WITH THE RELEASE OF PUBLICITY
The publicity surrounding this case might have ended sooner if not for a public battle between the East Baton Rouge Parish District Attorney and Clerk of Court. After defendant's arrest, news reports indicated that defendant received an early release from Hunt Correctional Institute, where he was serving a sentence for a simple burglary conviction, despite pending charges for a prior aggravated rape. Both the District Attorney and Clerk of Court publicly blamed the other for the "error" which resulted in defendant's early release. The confrontation between these two officials kept defendant's name and this case in the news. Furthermore, the public defender's office entered the controversy when it was reported that the District Attorney's office had agreed not to prosecute the aggravated rape charge in exchange for Williams' guilty plea to a simple burglary charge. This publicity, although involving them, was not initiated by the government officials; rather, it was they who were contacted by the news media.
LENGTH OF TIME BETWEEN DISSEMINATION OF THE PUBLICITY AND THE TRIAL
The pretrial publicity began on December 9, 1983, and was extensive until at least January 26, 1983. The trial began on April 18, 1983, almost three months after the news reports subsided. Defendant cites cases which found delays of from eight months to two years to be sufficient. We do not think that three months, a shorter time period, was an insufficient delay.
ATTITUDE OF THE COMMUNITY OR INDIVIDUAL JURORS
It does appear from the newspaper editorials that there was some outrage regarding defendant's early release from prison. That hostility, however, was not directed toward defendant. Rather, government officials were the focus of the community's chagrin. Furthermore, the voir dire examination does not reveal a prevailing attitude of hostility toward defendant.
JURORS' FAMILIARITY WITH PUBLICITY
We have also reviewed the voir dire examination and have found that great care was exercised in selecting a jury. Each prospective juror was individually questioned and was asked whether he or she had read or heard about the case from the news media, family or friends. Defense counsel also asked each person if they were familiar with the "Crime Stoppers" re-enactment of the incident.
The trial court, in denying the motion, stated that it was clear from the responses of the prospective jurors that very few were affected to any extent by any pretrial publicity. He added that two prospective jurors who were affected to the extent that they could not be impartial were eliminated by challenges for cause.
In his brief, defendant argues that sixteen of the prospective jurors heard of the case through either Crime Stoppers program, the news media or through discussions with family or friends.
After reviewing the record of the voir dire examination, we find that approximately eleven of the fifty-six jurors stated they were aware of the case. Of this number, *1341 six could not remember details of the incident. Only two of the three persons who saw the Crime Stoppers program were able to recall any details of the re-enactment. Two other persons either read or heard about the case. One recalled seeing a mugshot of defendant in the newspaper. The other recalled reading about the rape and that a suspect was arrested. Of the prospective jurors excused for cause, it appears that only five were possibly released because of their knowledge of the case.
While this case was the focus of a large amount of news coverage, we do not find that the public in this Parish was influenced or prejudiced by the pretrial publicity. In light of the small number of prospective jurors who even recalled the case during the voir dire, it cannot be said that the atmosphere was corrupted by press coverage. See State v. Clark, 442 So.2d 1129 (La.1983).
The granting of a change of venue rests with the sound discretion of the trial judge and his ruling denying a motion for a change of venue will not be disturbed on appeal unless the evidence affirmatively shows that such ruling was erroneous and a clear abuse of judicial discretion. Rodrigue, 441 So.2d 1274.
Defendant has not carried his burden of proof in showing that actual prejudice, influence or other reasons existed to prevent his obtaining a fair trial in Baton Rouge. Moreover, the evidence in the record shows that the trial judge acted within his discretion in denying the motion for a change of venue.
This assignment of error lacks merit.
ARGUMENT NUMBER 11
(Assignment of error number 47)
Defendant contends the trial court erred when it overruled his objection to the opinion testimony of Jerry Miller, an expert in the field of serology. He argues that this witness should not have been qualified as an expert due to his lack of formal training in the area of serology, chemistry, statistics, the lack of advanced degree and his reliance on an F.B.I. manual.
La.R.S. 15:466 provides that before any witness can give evidence as an expert his competency to so testify must be established to the satisfaction of the court. The competency of an expert witness is a question of fact to be determined by the trial court. The trial court is vested with wide discretion in this determination, and its ruling will not be disturbed on appeal in the absence of a clear showing of abuse. State v. Beridon, 449 So.2d 2 (La.App. 1st Cir.1984), writ denied, 452 So.2d 178 (La. 1984).
We have reviewed Miller's qualifications and conclude that the trial court did not abuse its discretion in qualifying him as an expert in the field of serology. Miller has a Bachelor of Science degree in zoology and attended Southeast Missouri State University for a Forensic Serology course. He also is a member of the Louisiana Association of Forensic Scientists and attends the seminars hosted by that organization. He has been employed as a serologist by the Louisiana State Police Crime Lab for approximately six years. Prior to that time, he was employed at a hospital to do blood typing. He had been qualified as an expert in serology approximately thirty to forty times in the 19th Judicial District Court in Baton Rouge. In light of the foregoing qualifications, we find no abuse of the trial court's discretion.
In addition, Miller also testified that some of his conclusions regarding percentages are based upon an F.B.I. manual. We do not find that his use of the F.B.I. manual should have prevented his being qualified as an expert.
This assignment of error is without merit.
ARGUMENT NUMBER 12
(Assignments of error numbers 52 and 53)
Defendant contends the trial court erred in allowing his mugshots to be admitted as evidence by the State. During the trial, the defense counsel objected to the admission of exhibits consisting of front and side *1342 view photographic lineups. These lineups each contain six photos of black males, including defendant, glued to a manilla file folder. The State introduced these exhibits during the testimony of Detective Groht. The trial court ruled that there was no indication these photos were mugshots and denied defendant's motion for mistrial on that basis. The court did agree to admonish Detective Groht not to refer to years or "anything indicative of prior arrests, specifically relating to prior dates." Defendant contends the mug shots, combined with the witness' testimony that the photographs were taken in 1979, were indicative of a prior criminal record and unduly prejudicial.
To be admissible, a photograph must be relevant to a material issue at trial, and its probative value must outweigh any possible prejudicial effect upon the jury. State v. Jones, 381 So.2d 416 (La.1980). As defendant has acknowledged consistently throughout his brief, the key issue in this case is the identification of defendant as the assailant. These photographs were relevant to the material issue of identification. Although some of the markings are visible and might indicate the photos are mugshots, we find the probative value outweighs the slight prejudicial effect, if any, upon the jury.
ARGUMENT NUMBER 13
(Assignment of error number 54)
By this assignment of error, defendant contends that the trial court erred in denying his motion for mistrial. The basis of the motion is that Detective Groht, a prosecution witness, referred during trial to the public defender office's representation of defendant.[18] Defendant does not indicate how he was prejudiced other than to say the jury would reason that no one else was willing to represent him.
Although the trial court noted it was not pleased with the references, he did not think a mistrial was warranted. He did offer to admonish the jury, but counsel declined this offer. Defendant argues that a mistrial should have been ordered under La.C.Cr.P. art. 775 because the reference to the public defender made it impossible for him to receive a fair trial.
La.C.Cr.P. art. 775 provides that, upon motion of a defendant, a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it impossible for defendant to obtain a fair trial. It is well established that mistrial is a drastic remedy and should be declared only when unnecessary prejudice results to the accused. The determination of whether prejudice has resulted lies within the sound discretion of the trial judge. State v. Brown, 434 So.2d 1166 (La.App. 1st Cir. 1983), writ granted on other grounds, 444 So.2d 1215 (La.1984).
We have reviewed the entire record and find that the two brief references to the public defender's office did not affect defendant's right to a fair trial. The trial judge did not abuse his discretion in determining that a mistrial was not warranted.
This assignment of error is without merit.
ARGUMENT NUMBER 14
(Assignments of error numbers 55 and 56)
Defendant contends that the trial court's order that he display a scar on his upper right arm was error. He does not contend the display of the scar was a violation of his Fourth or Fifth Amendment rights; rather, he urges that the issue is "whether the display before the jury was so highly prejudicial and suggestive as to cause substantial misidentification of a scar." In addition, he argues that it was error for the trial court to prohibit defendant from displaying other prominent scars on his arm. This prohibition, he argues, denied him of *1343 his constitutional right to present a defense and to confront his accuser.
Initially, we note that at trial counsel objected to the order that defendant display the scar on the basis that disrobing was offensive and deprived defendant of necessary respect. A new basis for an objection may not be urged for the first time on appeal. State v. Glaze, 439 So.2d 605 (La.App. 1st Cir.1983). We will, however, address defendant's argument.
Defendant treats the identification of the scar as an in-court identification of the offender and argues that the identification procedure was suggestive. We disagree.
Requiring a defendant to display a scar is demonstrative rather than testimonial evidence and that, as defendant acknowledges, does not violate his rights against self-incrimination. See State v. Anthony, 332 So.2d 214 (La.1976); State v. Brown, 326 So.2d 839 (La.1975), cert. denied, 429 U.S. 918, 97 S.Ct. 310, 50 L.Ed.2d 284 (1976). Before demonstrative evidence can be admitted into evidence, it must be shown that, more probably than not, the evidence is connected to the case. One method of establishing that foundation is by visual identification. Once that foundation is established, the weight to be given the evidence is a question for the jury. State v. Robertson, 441 So.2d 1281 (La. App. 1st Cir.1983).
In this case, a proper foundation was laid for admitting the identification of defendant's scar. Identity of the assailant was a key issue at trial. Since the victim testified she saw a scar on the assailant, the identification of the scar was certainly evidence connected to the case. The lack of positive identification goes to the weight of the evidence rather than to its admissibility. State v. Williams, 362 So.2d 530 (La.1978). In this case, however, the victim made a positive identification of the scar. Whether or not this was the same scar she observed on the assailant is a question of fact for the jury. See State v. Sam, 412 So.2d 1082 (La.1982).
We also note that the evidence is prejudicial to defendant, as it tends to prove he is guilty of the crime. See State v. Jackson, 450 So.2d 1053 (La.App. 1st Cir.1984).
Furthermore, the record indicates that defense counsel never asked that defendant be allowed to display other prominent scars. The trial court's statement that it would not let defendant take off anything other than his shirt to show the scar was clearly for defendant's protection.
The trial court did not err in requiring that defendant display a scar on his body, and these assignments of error are without merit.
ARGUMENT NUMBER 15
(Assignments of error numbers 57 and 58)
Defendant contends that the trial court erred in overruling his objection to the prosecutor's closing remarks. During the State's closing argument, the assistant district attorney referred to the "rights" of the victim, particularly the victim's right to be safe from attack in her own home. He also referred to the "rights" of the victim's husband and child. Defense counsel objected twice to this aspect of the prosecutor's argument. The trial court overruled the objections but did admonish the jury that the closing argument is not considered evidence and that counsel's statements were not controlling but only argument.
La.Code of Criminal Procedure article 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable in the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
A prosecutor's predictions as to the consequences of a not guilty verdict, or the societal costs of such a result, are clearly improper and should be avoided. *1344 State v. Craddock, 435 So.2d 1110 (La.App. 1st Cir.1983). We find that the prosecutor's remarks are analogous to, if not the same as, statements predicting the consequences of a not guilty verdict. Furthermore, the remarks were clearly an appeal to the emotions of the jurors.
Under La.C.Cr.P. art. 771, the judge is within his discretion, in the absence of clear prejudice, to admonish the jury to disregard a prosecutor's objectionable remark. State v. Lewis, 412 So.2d 1353 (La.1982). Furthermore, before a verdict will be overturned on the basis of improper argument, this court must be thoroughly convinced that the jury was influenced by the objectionable remarks and that they contributed to the verdict. See Craddock, 435 So.2d at 1121.
In light of the evidence, the prosecutor's otherwise even-handed closing argument and the trial judge's admonitions, we are not convinced that the remarks influenced the jury or contributed to defendant's guilty verdict.
These assignments of error are without merit.
ARGUMENT NUMBER 16
(Assignments of error numbers 59 and 60)
Defendant contends the trial court erred when it permitted the prosecutor to read to the jury during his rebuttal argument from La.R.S. 14:25 (accessory after the fact), a law not at issue in the case, and then failed to grant defendant's motion for mistrial.
Defendant's mother, Delores Williams, gave testimony supporting defendant's alibi defense. On cross-examination the prosecutor, in an attempt to impeach her credibility, inquired about her conviction in 1970 for accessory after the fact of murder. Mrs. Williams admitted she had been convicted, but the trial court would not allow questions about the definition of the crime.
During the State's rebuttal closing argument, however, the trial court permitted counsel to read the accessory after the fact statute. The court, however, did admonish the jury that statements in closing arguments are not to be considered as evidence.
The scope of argument by counsel is governed by La.C.Cr.P. art. 774, which provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
This article, however, does not provide sanctions against one who exceeds the permissible scope of argument. Comment (C) to the article indicates that, if argument goes beyond the scope of Article 774, it falls under the ambit of articles 770 and 771. Upon request of defendant the court may, in its discretion, grant a mistrial or an admonishment, premised upon argument by opposing party which is irrelevant or immaterial and of such a nature that it might create prejudice against defendant in the mind of the jury. La.C.Cr.P. arts. 770 and 771; Craddock, 435 So.2d 1110. The trial court judge, however, has wide discretion in controlling the scope of argument. Craddock, 435 So.2d 1110.
We conclude that reading the statute went beyond the allowable scope of argument as defined in La.C.Cr.P. art. 774. The accessory after the fact statute was not "the law applicable to the case." The prosecution was attempting to further impeach defendant's mother. Argument on the credibility of a witness is proper where the facts bearing on the witness' credibility appear in the record. State v. Sayles, 395 So.2d 695 (La.1981). Although Mrs. Williams' conviction of accessory after the fact appears in the record, neither the facts of the crime nor the law were made a part of the evidence at trial. The prosecutor did not attempt to clarify evidence already elicited. Defense counsel did not refer to the statute in her closing argument, so prosecutor's rebuttal argument should have *1345 been confined to answering defendant's argument. La.C.Cr.P. art. 774. See State v. Felde, 422 So.2d 370, 390 (La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).
In order for remarks outside the allowable scope of closing argument to be reversible error, this court must be thoroughly convinced that the jury was influenced by the complained of remarks and that they contributed to the verdict. State v. Craddock.
We have carefully reviewed the evidence and the closing arguments, including the trial court's admonition to the jury, and we note that the jury was well aware of Mrs. Williams' conviction. In light of the entire record, we are not convinced that the objectionable rebuttal remarks adversely influenced the jury or contributed to its verdict.
These assignments of error are without merit.
ARGUMENT NUMBER 17
(Assignment of error number 63)
Defendant contends the trial court erred in denying his motion for new trial based on newly discovered evidence and that this evidence constituted Brady material. Two of the grounds for that motion serve as the basis for this assignment. Defendant contends that after trial he discovered that test results determined the unidentified fingerprints obtained from the victim's home did not match the fingerprints of the plumber or carpenter working in the home the day the offenses occurred. In addition, he became aware after trial that the police, during their investigation, hypnotized a woman who resided near the victim and saw a black man doing yard work on the day of the rape.
A hearing on the motion was conducted, and evidence was presented. The State and defense counsel entered into a stipulation that the plumber and carpenter were not fingerprinted; that the State Police Bureau of Identification was not provided with copies of their fingerprints; and that their fingerprints were not compared with the unidentified fingerprints.
As to the second ground, Sgt. Newman of the Baton Rouge Police Department testified that he hypnotized a woman who remembered seeing a black man working in a yard near the victim's home. He stated she described the man as wearing a tan leather coat and blue jeans. Sgt. Newman testified that he saw and talked with this man the day of the offense and concluded that he did not fit the assailant's description, as he was much older and taller.
The trial court denied the motion for new trial. In ruling on the lack of fingerprints comparison, the trial court noted the stipulation between the State and defense counsel and the presumption that evidence not presented by one side is unfavorable to that side. The court stated that this evidence and information was available to the defense prior to trial and could have been used. It also added that this evidence, whether or not the fingerprints matched the unidentified prints, would not have affected the outcome of the trial.
As to the other ground, the trial court stated that although evidence of the woman hypnotized possibly should have been made available to the defense, presentation of this evidence would not have changed the verdict. The court noted what the woman's testimony would have been and that the man described was personally interviewed.
Louisiana Code of Criminal Procedure article 851 provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:

. . . . .
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty; ...
*1346 In considering a motion for new trial based on newly discovered evidence, the test to be used is not simply whether another jury might bring in another verdict, but whether the new evidence is so material that it ought to produce a different result than the verdict reached. The decision of the trial court on a motion for new trial will not be disturbed absent a clear abuse of discretion. Rodrigue, 441 So.2d 1274.
The trial court found that neither the evidence of the fingerprint comparisons nor the testimony of the woman hypnotized was so material that it would produce a different result than the verdict reached. It also found that the information regarding the fingerprints was available to defendant at trial and thus did not support the granting of a new trial.
During closing argument, defense counsel emphasized that there were fingerprints found in the home which were not identified. She suggested that those fingerprints were of the assailant. She also stated that the prosecution probably compared the prints to those of the carpenter and plumber and implied the State discovered that they did not match either of those workmen. In light of this closing argument and after reviewing the entire record, we cannot say that the jury would have reached a different verdict. Furthermore, although defendant did discover a potential witness after trial, we cannot say that this woman's testimony would have affected the outcome of the trial. Thus, we find no abuse of the trial court's discretion in its denial of the motion for new trial on the basis of newly discovered evidence.
Defendant also requests a new trial on the grounds that the evidence constitutes Brady material that should have been made available to him prior to trial. In light of the stipulation regarding the fingerprints, we find that no evidence regarding test results was withheld from defendant.[19] Since only evidence of the potential witness was not provided to defendant, we will only consider that evidence in the Brady argument.
In his Brady motion, defendant makes a general request for all information and evidence "which might tend to exonerate mover from the charges on which he was arrested, lessen his involvement in the crime charged, mitigate any sentence that might be imposed by the court, or tend to adversely affect the credibility of any witness to any portion of the incident, regardless of whether the State presently intends to call that witness at trial."
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
That court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), in regard to a general request for Brady material stated:
On the one hand, the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as *1347 when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.
(Footnote omitted.)
That court held that the omission must be evaluated in the context of the entire record and "if the omitted evidence creates a reasonable doubt that did not otherwise exist constitutional error has been committed." Agurs, 96 S.Ct. at 2402. See Sylvester, 388 So.2d 1155.
Also in regard to a motion for new trial that court stated:
If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
Agurs, 96 S.Ct. at 2402.
After reviewing the entire record, we conclude that the omitted evidence does not create a reasonable doubt that did not otherwise exist. The undisclosed evidence is not probative of defendant's innocence. Furthermore, there is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Agurs, 96 S.Ct. at 2400; Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). This undisclosed information does not create a reasonable doubt that did not otherwise exist.
Thus, we find that the State's failure to provide defendant with information about the neighbor who was hypnotized did not violate his constitutional rights. Moreover, the trial court did not err in denying defendant's motion for new trial.
This assignment of error lacks merit.
CONCLUSION
For all the reasons set forth, we affirm defendant's convictions and sentences.
AFFIRMED.
NOTES
[1] During his testimony, Dr. Sparks described the examination and tests conducted on the victim in this case, which are typically conducted on rape victims.
[2] The victim stated that her attacker had one arm around her neck and the other holding the knife to her throat when he forced her upstairs. She did not see how he could have touched the wall or bannister at this time. She also testified that she observed the man using his shirt to wipe off the bedroom door and knob before he left.
[3] In Coleman, however, the identification testimony was not in conflict; rather, one of the witnesses simply could not positively identify defendant as the intruder.
[4] These included defendant's motion for discovery, motion to reduce bond, motion to compel blood and saliva samples, motion to suppress photo and physical lineups, motion to show cause why the results of the blood and saliva samples from the defendant should be admitted into evidence, motion for cooperation and/or alternatively for the State to declare its intentions, motion and order to provide transportation for a polygraph examination, defendant's Brady motion, objection to State's answer to discovery and Brady as being incomplete and the State's motion for discovery.
[5] In State v. Ates, 418 So.2d 1326 (La.1982), a specific request was made for statements of a prosecution witness. In remanding to the trial court for an in camera inspection of the statements the Supreme Court stated that the standard employed in State v. Sylvester should be applied.
[6] Compare State v. Smith, 430 So.2d 31, 42 (La.1983), in which the Louisiana Supreme Court held the late disclosure of exculpatory evidence did not result in reversible error. Defense counsel sought a police dispatcher log and police offense report containing a description of the suspected assailant that did not match defendant.

A local newspaper article implied that the victim may have provided police with a different description of the assailant immediately following the rape. The court found that the offense report which contained a misdescription of defendant was exculpatory and material, for it concerned the reliability of the victim, a crucial State witness.
[7] At the time of defendant's trial, La.C.Cr.P. art. 799 provided for twelve peremptory challenges each for defendant and the State. This number was reduced to eight by Acts 1983, No. 495, § 1. Additionally, the trial judge has discretion to award additional peremptory challenges. Here each side was awarded an extra challenge for the selection of the alternate juror. La.C.Cr.P. art. 789.
[8] But see concurring opinion of Justice Dennis in State v. Eames, 365 So.2d 1361 (La.1979) in which he concluded the prosecutor's use of peremptory challenges to exclude blacks (from a jury including one black juror) is prohibited under Article I, § 3 of the Louisiana Constitution. In that case the prosecutor admitted the challenges were used to exclude blacks.
[9] Justices Marshall and Brennan are of the opinion that the State's use of peremptory challenges to exclude blacks from the petit jury may constitute a denial of a defendant's Sixth Amendment right to a jury drawn from a fair cross-section of the community. See dissent from denial of certiorari in McCray v. New York, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). The majority of the court has not thus far joined in this view.
[10] The source of La.C.Cr.P. art. 799 is former La.R.S. 15:354; Acts 1966, No. 310, § 1. La. Const. art. I, § 17, is based in pertinent part on La.Const. art. I, § 10 (1921), the constitutional provision reviewed in State v. Sharp.
[11] See State v. Nathan, 444 So.2d 231, 235 (La. App. 1st Cir.1983), writ denied, 445 So.2d 1232 (La.1984), in which defendant's photograph was the only photograph repeated in several lineup displays.
[12] In determining whether a ruling on a motion to suppress was correct, we are not limited to the evidence adduced at the hearing on that motion. We may consider all pertinent evidence given at trial on the case. State v. Chopin, 372 So.2d 1222, 1223 (La.1979).
[13] Defendant is in position number five in the photograph of the physical lineup.
[14] The victim recalled during her taped statement to police on December 15, 1982, that this man was looking for a "Williams" residence. This statement was made prior to the making of the identikit composite drawing and, thus, before the informant told police on January 3, 1983, that the suspect was Archie Williams. At the time the victim relayed this fact, Archie Williams was not even a suspect in the case.
[15] Act No. 181 of the 1983 Regular Session amended La.C.Cr.P. art. 800. This amendment makes it unnecessary for defendant to show that all of the peremptory challenges were exhausted before a complaint can be made regarding the trial judge's ruling on a challenge for cause. However, the amendment was not effective at the time of the trial and is not applicable in this case.
[16] Shortly after defendant was apprehended, it was reported in the news media that defendant had received an early release from Hunt Correctional Institute. Authorities at Hunt had been informed by the Clerk of Court's office that no charges were pending. Apparently defendant had previously been arrested for a rape occurring in 1979 but the District Attorney's office had not filed a bill of information or indictment. Thus, the computer in the Clerk's office did not show any outstanding charges filed against defendant. The Clerk of Court became embroiled in a quarrel with the District Attorney regarding Williams' early release and which office should accept blame.
[17] Defendant submitted, as evidence on his motion, exhibit D-21 in globo, consisting of clippings of newspaper articles, editorials and letters to the editor.
[18] Detective Groht twice referred to the public defender's office during her testimony regarding the physical lineup.
[19] Despite the stipulation entered into at the hearing on the motion for new trial, defendant argues in his brief that the prosecution should have provided him with fingerprint test results that the unidentified fingerprints did not belong to either of the workmen. He contends that "had the prosecutor informed defense counsel that the plumber and carpenter were printed and their prints did not match the unidentified prints the defendant would have been provided with information that shows the likelihood that someone other than defendant committed the crime."