395 So.2d 704 (1981)
STATE of Louisiana
v.
Johnny Lee COLEMAN.
No. 80-KA-1698.
Supreme Court of Louisiana.
March 2, 1981.
*705 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., John Sinquefield, Kay Kirkpatrick, Asst. Dist. Attys., for plaintiff-appellee.
Andrew Jack Bennett, Jr., Bennett & McLaughlin, Baton Rouge, for defendant-appellant.
LEMMON, Justice.[*]
The sole issue presented by this appeal from a conviction of attempted aggravated rape is the admissibility of defendant's confession.
Defendant, an 18-year old man, broke into an L.S.U. coed's apartment on July 31, 1976. He stabbed her pet dog, ripped out her telephone, and forced her with a knife into a bedroom, where he raped her. He than ransacked her apartment, looking for money and jewelry. Before leaving, he again raped the victim.
*706 Police investigators arrested defendant on the morning of August 16, 1976 for a series of rapes, one of which resulted in the death of the victim. Following his arrest, defendant made a series of confessions, including the confession challenged in this case.
He was indicted for multiple counts of rape and was convicted. That conviction was reversed because of the trial court's failure to sever the various counts and to require separate trials. State v. Coleman, 369 So.2d 1286 (La.1979).
Defendant was retried on this count alone, and after being convicted, he was sentenced to serve 50 years imprisonment at hard labor.[1]
The sole attack on the admissibility of the confession is based on the contention that defendant did not have the intellectual capacity to discern the meaning of the Miranda warnings and to choose knowingly between silence and speech. There are no complaints of police brutality, police promises or police conduct designed to overcome a suspect's will and to produce a confession which is not the voluntary product of his own choice.[2]
When the issue on appeal is whether an accused's level of intellectual disability precluded him from effectively understanding the essential nature of his rights to silence and counsel and of the consequences of his speech, much weight is accorded to the trial court's assessment. State v. Trudell, 350 So.2d 658 (La.1977); State v. White, 329 So.2d 738 (La.1976). Here, defendant makes no contention that an improper legal standard was applied by the trial court, but contends only that those standards were incorrectly applied under the facts of this case. Hence, we are reviewing only the application of well-settled principles. See Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972); United States v. Glover, 596 F.2d 857 (9th Cir. 1979); State v. Glover, 343 So.2d 118 (La.1977).
The testimony of two psychiatrists, a psychologist, the two interrogating officers, and the defendant himself was presented at the original hearing on the motion to suppress in 1977. After this court remanded the case for separate trials of each count and for reconsideration of the confession's admissibility, the trial judge conducted a new hearing on the motion to suppress, at which the parties introduced by stipulation all of the evidence taken on the original hearing. The trial judge then undertook another review of that evidence and listened to a tape recording of defendant's confession in its entirety, concluding that defendant, despite his low level of intellectual capacity, had the ability to understand his rights and to understand the significance of his decision and to speak and admit his wrongdoing. In denying the motion to suppress, the judge rendered the following reasons for judgment:
"This case was reversed by the Louisiana Supreme Court on the basis of improper joinder of six (6) counts. In the majority opinion, the court ordered the trial court to set aside the ruling of the trial judge that the taped confessions were freely and voluntarily given. The Supreme Court ordered that the admissibility of the confessions by [sic] determined anew in the event that the defendant is retried. This opinion concerns the admissibility of the taped confessions on counts one (1) and two (2). There was no confession on count four (4). The court will not render an opinion on the admissibility *707 of the confession in counts three (3), five (5) and six (6) until those matters are set for trial.
"In accordance with the instructions of the Supreme Court a hearing was scheduled on May 11, 1979. At that hearing, both the state and defense offered all of the evidence that had been presented at the Motion to Suppress at the original trial. The court reserved its ruling until it could re-examine all of that evidence and listen to the taped confessions of the defendant. The court has now read all of the evidence on the Motion to Suppress and has listened to the taped confessions on counts one (1) and two (2) in their entirety.

"Evidence in regard to both taped confessions (counts one and two)
"Dr. Curtis Steele, a psychiatrist, was a member of the Sanity Commission. On direct examination Dr. Steele stated that it was his opinion that the defendant was probably psychotic. He further stated that he was likely to react on impulse.
"He stated that at the original examination that he was unable to reach a conclusion as to the defendant's sanity at the time of the confessions. The original examination occurred on December 26, 1976. He stated that the interview had lasted twenty minutes. On the date of the hearing of the Motion to Suppress, Dr. Steele again examined the defendant. Dr. Steele stated that the defendant would appear to know what was going on. He stated that he was oriented to the time, place and situation. Dr. Steele concluded that although the defendant was a difficult person to work with, he essentially understood the nature of the charges, he knew who his attorneys were and could assist counsel.
"Dr. F.A. Silva, the second member of the Sanity Commission, also testified at the Motion to Suppress. Dr. Silva characterized the defendant as mildly to moderately retarded. The doctor stated that he had listened to the taped confession and it was his opinion that the defendant could not appreciate the depth and magnitude of the rights that he waived. On direct examination, he stated that in his opinion the defendant did not knowingly and intelligently waive his Miranda rights when he confessed on the tape. Dr. Silva stated that he had had a twenty minute interview with the defendant on December 19, 1976. Dr. Silva stated that in the interview the defendant didn't volunteer much information. The doctor concluded that he was not overly psychotic and his thought processes were very concrete. The doctor concluded the defendant was a very suspicious, anxious and hostile person. He stated that the defendant knew right from wrong but in a rather superficial way. On cross examination, the doctor stated that the defendant did understand when they told him he had the right to remain silent and he had a right to an attorney. He further stated that the defendant did understand the difference between right and wrong in a fairly concrete way. Dr. Hayworth L. Bradley, a psychologist from Southern University, stated that he had administered certain tests to the defendant. He stated that based upon these tests it was his opinion that the defendant was severely retarded. He did state that he suspected some malingering by the defendant but that he did not believe that the malingering was such that it would appreciably raise the IQ out of the retarded range. He stated that in view of the testing that he did, the defendant would not have any knowledge of the import of waiving his rights. It must be noted that Dr. Silva, using the same test results, felt that the defendant was mildly to moderately retarded. Dr. Silva also stated that there was a cultural factor built into the tests. He stated that most of the people in the defendant's cultural background would tend to perform lower on the tests. Also, Dr. Silva stated that it was reflected in one of the tests by Dr. Bradley a lack of cooperation which would have influenced the results of the tests. Dr. Silva concluded that the test in which he came out severely retarded on *708 was influenced by his lack of cooperation. Dr. Silva stated that the other tests showing him mild to moderate is where he was really functioning.
"Both officers involved in the investigation and the recording of the confessions, testified that they fully felt that the defendant freely and voluntarily confessed and that he knew what he was doing. On both confessions he was asked of his educational level and the defendant stated that he had gone to the tenth grade, he was able to read and write and he made C's and B's in school.
"The defendant testified at the Motion to Suppress. When asked about whether or not he was given his constitutional rights and defendant indicated that the officers kept reading him his rights every time they wanted to talk to him and that he got tired of hearing that. He further testified he already knew all of that since he had been through it when he was a juvenile.
* * * * * *
"Confession on Count Two
(Name of victim omitted)
"This interview lasted for twelve minutes. It began at 7:27 A.M. on August 16, 1976. In this confession Gill advised the defendant in detail as to his constitutional rights. The defendant indicated that he understood his rights. In this tape, the defendant gave more of a narrative as to the offense than he did in the tape on count one. He clearly explained the details surrounding the alleged offense.
"Conclusion
"In State v. Trudell, 350 So.2d 358 [658], the court stated:
`In order for an exculpatory statement to be admissible in evidence against an accused at trial, the state bears the burden of establishing beyond a reasonable doubt that the statement was freely and voluntarily made. La.R.S. 15:451, State v. Glover, 343 So.2d 118 (La.1977); State v. White, 329 So.2d 738 (La.1976); State v. Skiffer, 253 La. 405, 218 So.2d 313 (1969). Once a trial judge has determined that the state has met its burden of proof, his decision is entitled to great weight on review. State v. White, supra; State v. Hall, 257 La. 253, 242 So.2d 239 (1970).'
"The court further stated as follows:
`While a claim of mental illness normally requires a defendant to establish by a preponderance of the evidence that he has a mental illness, where the voluntariness of his confession is at issue the state, having the burden of establishing that the confession was voluntary, still retains that burden. State v. Glover, supra. In such a case, the state must prove that defendant's level of mental illness did not preclude him from giving a voluntary statement and that he did do so.'
"After carefully reading and remembering the testimony of those who testified at the original suppression hearing and after listening to both confessions completely, the court is convinced that the state has carried its burden of proof beyond a reasonable doubt and that the statements were freely and voluntarily made. Although there was evidence that the accused was somewhat retarded, considering his testimony, his description of the events and his waiver of rights on the tapes and considering all of the other witnesses and their testimony, the court feels that it is clear that mental illness did not preclude him from giving a voluntary statement. Therefore, the court holds that neither of the two confessions should be suppressed."
We cannot find that the trial court erred in reaching that conclusion. Defendant was an 18-year old who had gone to the tenth grade. He stated in his confession that he made B's and C's in school and that he could read and write. While the psychiatrists and psychologist diagnosed his condition as mild to moderate mental retardation, the officers who questioned him believed that he was aware of his rights and of the consequences of choosing to talk about his crimes. The trial judge, who observed *709 defendant as he testified at the hearing, also concluded that he could appreciate the import of the warnings given by the police and was aware of the consequences of speaking about his crime without the aid of counsel.
Defendant argues, however, that two of the experts opined he was not capable of "intelligently waiving" his rights. We note that one admitted defendant may have been "malingering" during his I.Q. test, while the other admitted defendant could understand the warnings, but questioned whether defendant could appreciate the serious consequences of "waiving" his rights.
The opinions of experts on the question of "waiver" of constitutional rights may be helpful, but are certainly not binding on the trial court. The decision on the validity of a waiver is ultimately one for the court. Experts in psychiatric medicine or psychology can give opinions on an accused's mental ability to perform certain functions, but the court must decide whether the accused, with the described mental ability, has the capacity to stand trial or the capacity to waive rights. The concept of "knowing" and "intelligent" waiver is one which our jurisprudence has developed. See U.S. v. Glover, above; State v. Trudell, above. There is no controlling psychiatric principle. See State v. Bennett, 345 So.2d 1129 (La.1977), in which this court cautioned trial courts not to base judgments regarding capacity to stand trial only on conclusory opinions of experts unsupported by enumerated factors.
Just as in cases in which the accused's capacity to stand trial is at issue, the trial court's judgment must be accorded much deference in cases involving an accused's capacity to waive rights.[3] See State v. Rochon, 393 So.2d 1224 (La.1980); State v. Holmes, 393 So.2d 670 (La.1980). After reviewing the record of the hearing on the motion to suppress, we conclude the evidence supports the trial court's determination that defendant knowingly waived his right against self-incrimination.
Furthermore, we have reviewed the tape recording of defendant's confession. The interrogating officers did everything possible to inform defendant of his constitutional rights and to explain that he did not have to give a statement and that he was entitled to have a lawyer advise him free of charge. Under these circumstances, in which any person who understands street terms had to know he did not have to talk about the crime, and in which the confession was clearly voluntary, we conclude the privilege against self-incrimination was not violated.
The motion to suppress defendant's confession was properly denied.
The conviction and sentence are affirmed.
NOTES
[*] Judges Guidry, Foret and Laborde of the Court of Appeal, Third Circuit, participated in this decision as associate justices ad hoc, joined by Chief Justice Dixon and Associate Justices Marcus, Blanche and Lemmon.
[1] Prior to this trial the count was amended to charge attempted aggravated rape. Because the United States Supreme Court had declared the death penalty for aggravated rape unconstitutional in Selman v. Louisiana, 428 U.S. 906, 96 S.Ct. 3214, 49 L.Ed.2d 1212 (1976), defendant could only be sentenced to the most serious penalty for a lesser included offense. See State v. Lee, 340 So.2d 180 (La.1976).
[2] The state is required to prove that a confession was voluntarily given after full compliance with the warnings required by Miranda and by La.Const. Art. I, § 13 (1974). State v. Glover, above; R.S. 15:451; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See also C.Cr.P. art. 703. The trial judge must find that the state carried its burden beyond a reasonable doubt. State v. Welch, 337 So.2d 1114 (La.1976).
[3] Of course, the cases concerning capacity to stand trial involve a trial court's evaluation of the present mental status of the defendant, while the determination of capacity to waive rights involves a trial court's evaluation of the defendant's present mental capabilities as a method of ascertaining his mental capacity at the time of the interrogation.