584 So.2d 282 (1991)
STATE of Louisiana
v.
Michael A. ONDEK.
No. KA 90 1211.
Court of Appeal of Louisiana, First Circuit.
June 27, 1991.
Review Denied October 4, 1991.
*285 William R. Campbell, Jr., New Orleans, David J. Knight, Covington, for appellee.
Clifford E. Cardone, New Orleans, for appellant.
Before COVINGTON, C.J., and LANIER and GONZALES, JJ.
COVINGTON, Chief Judge.
Michael Ondek was charged by indictment with second degree murder, a violation of La.R.S. 14:30.1. He pled not guilty and not guilty by reason of insanity. After a jury trial, defendant was found guilty as charged. He was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. He now appeals, urging ten assignments of error as follows:
1. The trial court erred in not granting a new trial on the ground that the verdict was contrary to the law and the evidence, to wit: defendant proved, by a preponderance of evidence, that he suffered from a mental disease which prevented him from distinguishing right from wrong.
2. The trial court erred by admitting a confession, obtained from the defendant during a manic/psychotic episode and without full Miranda warnings.
3. The trial court erred in ordering defendant to undergo an "independent" psychiatric examination after the defense had called all three of its expert psychiatric witnesses thereby preventing the defendant from having his witnesses review or comment on the prosecution's psychiatric testimony.
4. The trial court erred in permitting the state's psychiatrist, who examined the defendant after his trial began, to testify.
5. The trial court erred in permitting the state to force the defendant to undergo a second "independent" psychiatric examination conducted by an expert selected by the state.
6. The trial court erred in not granting a mistrial when a state witness, who had already been instructed in limine, commented on defendant's previous arrests.
7. The trial court erred in not granting a mistrial or not admonishing the jury when the prosecutor remarked in his closing argument that the defendant had not been a danger to himself and society for *286 about two years, thereby alluding to the fact that he would be released immediately.
8. The trial court erred in not granting a new trial due to its failure to provide the defense an opportunity to rebut psychiatric testimony of the prosecution.
9. The trial court erred in permitting a prosecution witness, who was exempted from the sequestration order and who was present in court throughout the trial, to testify over defense objection.
10. The trial court erred in limiting defendant's voir dire questioning of prospective jurors about the insanity defense.

FACTS:
On November 30, 1987, defendant, Michael Ondek, was driving a red Mercedes sports car on Highway 190 in Mandeville with the vehicle's hazard lights on. As he passed the intersection of Highway 190 and Greenleaves Subdivision, defendant struck a car in front of him which was being towed by a tow truck operated by Keith Mackey. Mackey exited his truck and walked to the driver's side of the Mercedes. The two men had a conversation lasting about fifteen seconds. Mackey walked back to the truck and picked up his mobile radio to call his sister. Defendant backed his Mercedes into a vehicle behind him, which was stopped for the red light at the intersection. The Mercedes started to pull out of its lane and veered to the left. Mackey again walked back to defendant's vehicle and made a gesture to defendant, conveying something about defendant's action of backing his car into the motorist behind him. Then Mackey walked back to the cab of his tow truck. Defendant pulled his vehicle to the left of Mackey's truck and fired a .357 magnum several times, shattering the passenger window of his car and striking Mackey, who was again on the mobile radio. Defendant sped away in his Mercedes at a high rate of speed. The driver in the car behind defendant pulled to the right hand side of the road and went to assist Mackey, who was bleeding and slumped over the steering wheel of the tow truck. A few seconds later, the Mandeville police arrived; Mackey was transported to a local hospital where he died.
Carla Parks, Mackey's sister, was on the radio with Mackey when he indicated that he was being pushed thru the redlight. She called the police and reported what Mackey had told her. A short time later, Mackey advised her by mobile radio that he had been shot. Parks made another call to the police to report the shooting. Mackey's brother-in-law, Tommy Parks, was present when the victim first called in on the radio; he left immediately to go to the scene before Mackey called back the second time.
After shooting Mackey, defendant drove to the office of Sabbas Niagkinis, who was defendant's business partner. Defendant said that someone was trying to kill him and that he killed this person first. At first defendant stated that the person he killed was his landlord; then, he stated the person was a tow truck driver. Niagkinis, who at first did not believe defendant, told him to go home and think or go to the police. After their conversation, defendant left the office and drove away.
Subsequently, defendant was apprehended by the Mandeville police, when a chase of defendant's vehicle ended with his striking a tree. Defendant was injured in the accident and had to be extricated from the vehicle. Once out of the vehicle, defendant gave several oral statements (one of which was taped) to police. Also, several times defendant asked the officers around him to "synchronize their watches." When defendant was treated for his injuries at the local hospital, he continued to order people to synchronize their watches. Also, he was combative and belligerent, pulled the IV out of his arm, and demanded a hot tub and whirlpool. Subsequently, defendant was charged with second degree murder.

SUFFICIENCY OF THE EVIDENCE

(ASSIGNMENT OF ERROR NUMBER ONE)
By this assignment of error, defendant contends the jury's verdict was contrary to the law and evidence and that the trial *287 court erred in denying his motion for new trial. Specifically, he argues that he proved, by a preponderance of the evidence, that he was insane at the time of the offense. Defendant contends that testimony about his actions on the day of the offense and the expert and lay testimony are consistent with a determination that he was insane.
The state bears the burden of proving beyond a reasonable doubt each element of the crime necessary to constitute the defendant's guilt. La.R.S. 15:271. However, a defendant is presumed sane at the time of the offense; the state is not required to prove sanity. La.R.S. 15:432; State v. Weber, 364 So.2d 952, 956 (La. 1978); State v. Pravata, 522 So.2d 606, 613 (La.App. 1st Cir.), writ denied, 531 So.2d 261 (La.1988). A defendant who wishes to negate the presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. In order to establish that he should be exempt from criminal responsibility, the defendant must show that because of a mental disease or mental defect he was incapable of distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Pravata, 522 So.2d at 613.
Defendant claims that the expert testimony, viewed as a whole, proved he was unable to distinguish between right and wrong at the time of the offense. Furthermore, he claims that the defense experts were better informed, had a stronger factual basis for their opinions and were in the best position to give an accurate assessment of defendant's sanity at the time of the offense. The defense experts who testified were Drs. Albert DeVillier, Aris Cox, and Chester Scrignar.
Dr. DeVillier, a forensic psychiatrist, testified that he examined defendant on December 12 and December 14, 1987. When Dr. DeVillier first saw defendant, he was agitated, screaming and pulling apart his leg cast. On December 14, defendant was in the same state. Dr. DeVillier's psychiatric impression was paranoid schizophrenia or bipolar disorder with psychosis. According to this expert, on the dates that defendant was examined, defendant was not legally sane. He believed that defendant could not distinguish between right and wrong and "even if he did, he could not control himself." Dr. DeVillier also reviewed records of defendant's prior hospitalizations and had information about defendant's activities before the shooting. As to defendant's sanity on the date of the offense, Dr. DeVillier testified that defendant in all probability was manifesting a manic episode. The doctor also stated that there was a good chance that "he could tell right from wrong;" however, Dr. DeVillier implied that defendant's ability to distinguish did not "make any difference," because he could not control his behavior. The psychiatrist also stated that he believed defendant suffered from a psychosis which made him legally insane. This opinion was based (in part) on the lack of finding alcohol or drugs in defendant's system by a hospital drug screen conducted after defendant was placed in custody.
Dr. Aris Cox, another psychiatrist, testified that he examined defendant and reviewed medical records which were sent to him by the District Attorney's office. Initially, he was hired by the state to examine defendant and render an evaluation. He examined defendant in the parish jail on January 30, 1990, and on February 19, 1990, for a total of three hours. He also reviewed records from the following institutions: (1) Feliciana Forensic Facility (where defendant was committed following an initial finding he was incompetent to stand trial), (2) Charity Hospital (where defendant received treatment for his physical injuries), (3) Highland Hospital (the local hospital that initially treated defendant following his arrest), (4) the Virginia hospital (where defendant was committed in 1980), and (5) St. Tammany parish jail records. He also reviewed police reports and statements. Dr. Cox's opinion was that defendant had manic depressive or bipolar illness. He further opined, based on the records he reviewed, that at the time of the offense defendant was psychotic and in a *288 manic episode and could not distinguish between right and wrong. He disagreed with the diagnosis of Dr. Applebaum, the state's psychiatrist, who determined that defendant had a mixed character disorder. Dr. Cox did not believe Dr. Applebaum completed sufficient psychological testing to draw valid conclusions. He also noted that defendant had been on medication prior to his evaluation by Dr. Applebaum. Although defendant's education in psychology would enable him to malinger and make up things to support the diagnosis of a mental disease, Dr. Cox found there was independent observation from 1980 that defendant acted in a bizarre fashion and, thus, had a mental illness.
Dr. Chester Scrignar, another psychiatrist, testified that he examined defendant for a couple of hours on December 7, 1987, when he was hospitalized at Charity Hospital. He also interviewed defendant's wife, father and stepmother. In his testimony, Dr. Scrignar thoroughly reviewed the medical records and summarized the facts that he knew about defendant, based on a review of the records and his interviews. He concluded that defendant suffered from bipolar disorder, manic type with psychosis. Furthermore, he opined that defendant did not know the difference between right and wrong when he shot the victim. He disagreed with the diagnosis of intermittent explosive disorder. Dr. Scrignar said this diagnosis was extremely rare; he had never before seen it diagnosed. He also disagreed with Dr. Applebaum that defendant was malingering. On cross-examination Dr. Scrignar's testimony included other significant facts. Dr. Scrignar admitted that defendant was reading the Diagnostic and Statistical Manual of Mental Disorders (DSM Manual) when he interviewed him. Although he agreed that defendant is a manipulator, Dr. Scrignar emphatically stated that he did not believe defendant was malingering. Furthermore, in his review of the report of the drug test conducted on defendant on November 30, 1987, he found that the test did not screen for LSD.
On the state's rebuttal, Drs. Theresita Jiminez, Alan Applebaum, and Martin Kelly testified as expert witnesses. Dr. Jiminez, a psychiatrist at the Feliciana Forensic Facility, testified that she initially examined defendant on December 28, 1987. Her initial diagnosis was schizo affective disorder, a psychosis. She again examined defendant on April 28, May 6, June 1, June 3, June 13, and June 28, 1988. On the last visit, she noticed that defendant was doing well and was not suffering from any major mental illness. She diagnosed defendant as having an intermittent explosive disorder resulting in defendant getting very angry and having poor impulse control. Furthermore, she opined that, at the time of the offense, defendant was capable of distinguishing between right and wrong.
Dr. Applebaum, a clinical psychologist, testified that he saw defendant when defendant was admitted to Feliciana Forensic Facility. The purpose of his first contact was to complete a formal assessment. During the initial interview, defendant refused to give the doctor consent to obtain defendant's records from his previous psychiatric hospitalizations. According to Dr. Applebaum, defendant's explanation was that "he wanted to appear sick enough in order to avoid prosecution for the crime, but not sick enough to be sent back to our facility [Feliciana Forensic Facility]." Later, Dr. Applebaum completed a more comprehensive assessment of defendant. He determined that defendant did not have a major mental disorder; rather, defendant was a person who had a lot of difficulty in controlling anger. Based upon defendant's statement that he "wanted to enter a plea of temporary insanity" and defendant's control of information, Dr. Applebaum determined that defendant was malingering. When the psychiatrist informed defendant there was no such plea and that the correct plea was not guilty by reason of insanity, defendant stopped using the incorrect phrase and began using the correct legal term.
Dr. Martin Kelly, a psychiatrist from Boston, testified that he was sent defendant's records by the state in June of 1989 for review. Dr. Kelly examined defendant on two occasions, the night before and the morning before the doctor testified at trial; *289 and he reviewed medical records, police reports and the statements related to this case. During his testimony, Dr. Kelly explained the different categories of mental illness and stated that a person suffering from a major mental disease is not necessarily incapable of distinguishing between right and wrong. He concluded that on the date of the offense defendant had a manic depressive disorder or bipolar disorder. Dr. Kelly suggested that defendant was in manic periods when he was hospitalized in 1980 and again in 1987 at the time he shot the victim. His opinion, based upon a review of the records and interviews with defendant, was that defendant had the ability to distinguish between right and wrong at the time of the offense. Dr. Kelly also indicated that defendant's actions in fleeing the scene, wanting to hide his vehicle at his business partner's building, and avoiding the police during a high speed chase, support the conclusion that he had the capacity to appreciate right from wrong. Although defendant was suffering from a mental disease during this offense, according to Dr. Kelly it was not severe enough to negate defendant's ability to distinguish between right and wrong. Dr. Kelly did not find defendant's statements about synchronizing watches particularly significant in determining legal sanity at the time of the offense because no one asked defendant why he made this request. When Dr. Kelly asked defendant about this request, defendant was not clear. Dr. Kelly suspected the request was connected to a delusion (an outrageous belief as opposed to a hallucination) that something was to happen at a certain time.
The state and defense also presented the testimony of lay witnesses to support their respective legal theories. The defendant's business partner in a sales business, Sabbas Niagkinis, and several Mandeville police officers testified about defendant's behavior before and after he shot Mackey. Sabbas Niagkinis testified that he knew defendant for two years prior to the offense. He knew defendant as a hard worker and friendly person. Approximately one and one half months before the offense, defendant told Niagkinis he purchased a gun to protect himself and his family from some "people in Florida" who were out to get him. This witness stated that defendant had previously mentioned that he had a business in Florida in which investors lost money. Niagkinis thought those people may have been the ones to whom defendant referred as wanting to kill him. The morning of the offense, defendant came into Niagkinis' place of business; defendant said, in a casual manner, that he had been hired to kill Niagkinis. Defendant stated that someone he met at a business show had "put him up to kill" Niagkinis. When Niagkinis asked defendant if he were okay, defendant replied he was just joking and kidding. The same day, after the shooting, defendant returned to Niagkinis' office. Defendant stated that somebody was trying to kill him and he had killed that person first. When defendant was asked who he had killed, he first replied his landlord. Then defendant said, "I really don't know. Maybe the tow truck man." Niagkinis further testified that when defendant asked him to hide the Mercedes in the back of the building, Niagkinis told defendant to go home or to go to the police. Then defendant walked out of the office and sped off in his car. Later, Niagkinis received a telephone call; and, during the conversation, he was told that someone had been shot on Highway 190. Niagkinis called a police officer whom he knew and told him of his conversation with defendant.
Several Mandeville police officers testified as to defendant's actions when he was pursued by the police and after he was apprehended. Officer Bravata testified that he was at a police roadblock on Highway 190 when he saw a red Mercedes dodge the roadblock. He and another police officer pursued defendant in their police car. Defendant drove his vehicle in circles, across a ball field, struck a police vehicle and a chain link fence, and sped through a subdivision before he struck an oak tree.
Chief Tom Buell arrived shortly after defendant's vehicle crashed. Upon arrival, Chief Buell checked on defendant's condition *290 and advised his office to dispatch two ambulances, one for defendant, who had received injuries when he crashed his vehicle, and another for an injured police officer. Then, Chief Buell advised defendant of his Miranda rights and talked with him about the incident. Defendant gave a taped statement shortly before the ambulances arrived. The police chief testified that defendant asked people at the scene to synchronize their watches at least three times. On cross-examination, the chief stated he believed defendant's answers were responsive to his questions; but he could not explain some of the answers. That portion of the taped statement, exhibit D-1, is as follows:
Q. Are you willing to tell me exactly word for word what you just told me about what happened tonight?
A. Yes sir, Michael Ondek
Q. O.K. Michael, exactly what happened tonight on 190?
A. Which way is 190?
Q. That is the road that you were on in front of Green Leaves.
A. Well, I was going home my usual route. I was going to make a left turn to go home to my house in the village. There was a tow truck with a vehicle on it blocking my way. I got behind him and I waited for him to move and he didn't so I thought I would give him alittle [sic] nudge, you know to get him going. Uh, he came out with a gun. I immediately without even thinking jerked my wheel, (OH! I can't, let me think) I jerked with this hand, my left hand and I pulled out my gun and I shot him and I drove away.
Q. How many times did you shoot the subject?
A. I believe five, I'm not sure though, I haven't checked the gun.
Q. The gun was fully loaded?
A. Yes it was
Q. What kind of gun did the other subject have that you say you saw?
A. I really don't know, it was such a flash of a moment it could have been anything.
Q. O.K. why, did you strike the vehicle that the wrecker was towing?
A. Oh, I believe he backed into me, I didn't start, I didn't, I didn't, (OH, Uh, I need a hospital, man bad)
O.K. we have the ambulance in route.
Officer Dale McWilliams testified that he recovered the .357 magnum pistol from defendant's vehicle after it crashed and defendant was in custody. He testified that it took about fifteen to twenty minutes to extricate defendant from his vehicle and that defendant had injuries to his lip, nose, knee, ankle, hip and leg. He also heard defendant scream to people to synchronize their watches and saw him cursing, screaming, talking fast and acting combative at the scene. At the hospital where defendant was taken for his injuries, the officer saw defendant continue to order people to synchronize their watches, to act confused and belligerent, and to also pull an IV out of his arm. Defendant, who refused to give his wife his watch and ring, also constantly demanded a hot tub and whirlpool.
On his case in chief, defendant's father, an American Express employee who saw defendant a few hours before the shooting, a paramedic and a nurse who treated defendant, a parish jail nurse, and three psychiatrists who examined defendant testified.
Andrew Ondek, defendant's father, testified that his son had a history of psychiatric hospitalizations in Virginia beginning in 1980, the first lasting for two weeks. Mr. Ondek had defendant committed when defendant became irrational and made statements that he was physically dead, wanted his apartment exorcised, and wanted certain tapes played in his apartment for further direction. He also laid on the sofa, said he saw his spirit above him, and said that his body was only a shell and that he would be buried in three days. Mr. Ondek also found notes in defendant's handwriting which stated "killed and ordered, Carter, Nixon, Agnew, Ayotollah Kolhmeni [sic], Jim Baker, 700 Club and John Anderson." Additionally, Andrew Ondek testified that his mother and four siblings (defendant's grandmother, three aunts and *291 an uncle) were hospitalized with mental problems. Defendant was hospitalized again in Virginia in 1980. On cross-examination, Andrew Ondek admitted that his son had a Bachelor of Arts degree in psychology. He further agreed that the records of defendant's first hospitalization indicate defendant appeared able to manage his own affairs and there was no evidence of psychosis, suicidal or homicidal tendencies.
Cynthia Adams, an employee of American Express in New Orleans, testified that defendant came into her office on November 30, 1987, at 2:30 or 3:00 p.m. Defendant, who had previously been in to open an account, was upset and irate that the manager was not in the office. Defendant was loud, paced up and down, and ran his hands through his hair. Finally, he left the office.
Tom Wallace, a paramedic who treated defendant at the scene of his automobile accident, testified that defendant was agitated when he arrived on the scene. Defendant repeatedly asked the witness to synchronize his watch with that of defendant. Defendant responded to questions, knew who he was and knew the general time of the day. Mr. Wallace further testified that defendant thought he was in Florida and occasionally appeared to hallucinate. According to Wallace, at the time, he would not have been surprised if a psychiatric consultation or drug screen were ordered for defendant.
Merle Williams, an emergency room nurse, testified that defendant was screaming for water and yelling when he entered the hospital. Defendant pulled out his IV and refused to give his jewelry to his wife. Nurse Williams further testified that she did not know how defendant pulled out the IV and that he could have been screaming for water because he was thirsty. The prosecutor elicited further testimony from the nurse that would offer an explanation, other than mental illness or insanity, for his actions.
Dr. Kenneth Nall, the emergency room physician who treated defendant, recalled that defendant initially asked him what time it was and then corrected the doctor by pointing a finger at him and calling him a "bad apple." He suspected defendant's behavior was related to drug usage and ordered a drug screen. When received, the results only showed a trace of a compound found in aspirin. However, at trial, Dr. Nall could not tell from the report if the drug test screened for common "street drugs."
The question of whether defendant has affirmatively proved his insanity and should not be held responsible for his actions is one for the jury. State v. Marmillion, 339 So.2d 788, 795 (La.1976); State v. Pravata, 522 So.2d at 614. All of the evidence, including both expert and lay testimony, and the actions of the defendant, should be considered by the jury in determining sanity. State v. Pravata, 522 So.2d at 614. When a defendant who affirmatively offered the defense of insanity claims that the evidence does not support a finding of guilt beyond a reasonable doubt, the standard for review by an appellate court is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Claibon, 395 So.2d 770, 772 (La.1981); State v. Pravata, 522 So.2d at 614.
We conclude the jury was presented evidence upon which it could conclude defendant did not prove he was insane at the time of the offense. Only two of defendant's experts, Drs. Cox and Scrignar, concluded that defendant could not distinguish between right and wrong at the time of the offense; Dr. DeVillier, another defense witness, concluded there was a good chance that defendant could distinguish between right and wrong. In rebuttal, the state's experts concluded defendant was able to distinguish between right and wrong. Moreover, Dr. Applebaum's conclusion that defendant was malingering is consistent with Dr. Scrignar's observation that defendant was reading the DSM Manual when he was observed. Also, we note that Dr. Scrignar agreed that defendant is *292 a manipulator. Moreover, Dr. Kelly's opinion that defendant was able to understand the difference between right and wrong merely corroborated the testimony presented by the two other state experts.
Herein, we find, in light of the evidence presented, any rational trier of fact could have found that defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
This assignment of error lacks merit.

MOTION TO SUPPRESS CONFESSION

(ASSIGNMENT OF ERROR NUMBER TWO)
By this assignment of error, defendant contends the trial court erred in admitting a taped confession made to Chief Tom Buell. Essentially, defendant argues that, because he was insane at the time of the confession, the state did not meet its burden of proving that the statement was free and voluntary and given without duress. Defendant further argues that the confession is inadmissible because he was not given full Miranda rights. In advising defendant of his rights prior to the confession, Chief Buell did tell defendant he had a right to counsel, but failed to tell defendant that an attorney would be appointed if he was indigent.
Defendant filed a pre-trial motion to suppress the confession made to Chief Buell.[1] In that motion, he urged the same grounds. The trial court denied the motion as to this confession. Defendant filed an application for supervisory writs with this Court, seeking a review of the trial court's ruling. This court affirmed the trial court's ruling that the confession was admissible and added to the district court's reasons. Subsequently, defendant sought review with the Louisiana Supreme Court, which ruled that this confession was admissible.[2]State v. Ondek, 550 So.2d 640 (La.), order clarified, 551 So.2d 1312 (La.1989). In this appeal, defendant again alleges the trial court's ruling is erroneous.
Although a pre-trial determination of the admissibility of evidence does not absolutely preclude a different decision on appeal, judicial efficiency demands that this Court accord great deference to its pre-trial decisions unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result. See State v. Johnson, 438 So.2d 1091, 1104-1105 (La.1983). Herein, we do not find that the previous ruling was patently erroneous or produced an unjust result.
Nevertheless, we will address defendant's arguments as to this issue. First, defendant raises the issue of the voluntariness of defendant's confession based upon the premise that he was insane at the time it was made.
The State may rely on the presumption of sanity provided in La.R.S. 15:432, leaving to the defendant the burden of proving the existence of a mental abnormality which, under the circumstances, may have destroyed the voluntary nature of his confession. State v. Waymire, 504 So.2d 953, 958 (La.App. 1st Cir.1987). A claim of mental illness or introduction of evidence thereof does not shift the ultimate burden of voluntariness from the State. If defendant fails to prove the existence of a mental defect or fails to prove that such disorder prevented his confession from being voluntary, the State is not required to negate defendant's mental abnormality; but the State must in other respects prove beyond a reasonable doubt that the confession was voluntary. State v. Waymire, 504 So.2d at 958. Because a defendant is presumed competent, the defendant has the burden of proving mental defect such that *293 he was unable to understand his Miranda rights and, therefore, incompetent to waive them. State v. Waymire, 504 So.2d at 958.
With regard to the relationship between diminished mental or intellectual capacity and involuntariness, a condition does not of itself vitiate the ability of a defendant to knowingly and intellectually waive constitutional rights and make a free and voluntary confession. The critical factors are whether the defendant was able to understand the rights explained to him and whether he voluntarily gave a statement. State v. Benoit, 440 So.2d 129, 131 (La.1983); State v. Young, 469 So.2d 1014, 1018 (La.App. 1st Cir.1985). Furthermore, once the trial court has determined that the state has met its burden of proof, its decision is entitled to great weight on review. State v. Lefevre, 419 So.2d 862, 865 (La. 1982).
Opinions of experts on the question of "waiver" of constitutional rights may be helpful but are not binding on the court. The decision on the validity of a waiver is ultimately for the court. There is no controlling psychiatric principle. State v. Lefevre, 419 So.2d at 865; State v. Coleman, 395 So.2d 704, 709 (La.1981).
Chief Buell, who obtained the statement, testified that defendant was alert, talked clearly, made eye contact, appeared to know what had taken place, and had no trouble recalling the day's events during the statement. Furthermore, defendant's intellectual capacity did not appear to be diminished; defendant appeared to know his rights and understand them. The testimony of Officer Tommy Brazille and Detective McWilliams corroborated this version. Thus, the record does not reflect that defendant's mental defect, if any, destroyed the voluntary nature of the confession. The state's evidence provides a sufficient basis for a conclusion that the statement was free and voluntary and that the trial court's ruling denying defendant's motion to suppress is correct.
Additionally, the record reflects that defendant was advised of his right to counsel; however, he was not advised of his right to appointed counsel if he was indigent. Although the Louisiana Supreme Court found such an omission from the Miranda warnings to be fatal in State v. Skiffer, 253 La. 405, 218 So.2d 313, 314 (1969), we do not find that the defect is fatal in this case.[3] Since defendant retained counsel for pre-trial motions and for trial, he obviously was not indigent, and the officer's failure to warn defendant of the right to appointed counsel was not prejudicial. Compare United States v. Messina, 388 F.2d 393 (2d Cir.), cert. denied, 390 U.S. 1026, 88 S.Ct. 1413, 20 L.Ed.2d 283 (1968).
This assignment of error lacks merit.

SECOND PSYCHIATRIC EXAMINATION BY THE STATE

(ASSIGNMENTS OF ERROR NUMBERS THREE, FOUR, FIVE, AND EIGHT)
By these assignments of error defendant contends that the trial court erred in 1) allowing a second state psychiatrist, Dr. Martin Kelly, to conduct a psychiatric examination of defendant after defendant was found insane by the state's first psychiatric expert; 2) allowing the examination to take place after the second day of trial and after the close of the defendant's case, thereby preventing full discovery, full cross-examination of the doctor and preparation of a defense; 3) allowing two state experts, whose qualifications do not meet necessary statutory requirements, to give testimony as to insanity; and 4) allowing Dr. Kelly's testimony during the state's case in rebuttal and denying the defendant surrebuttal.
*294 Specifically, as to the argument that the state violated discovery requirements and denied defendant's right to effective crossexamination and to prepare a defense, defendant argues the state withheld knowledge of "the results or preliminary evaluations made by Dr. Kelly" which it had before trial. He refers to Dr. Kelly's testimony that an inquiry was made by the state in December of 1988 about the possibility of testifying and that he received records regarding defendant from the state in June of 1989.
La.C.Cr.P. art. 719 provides:
Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or copies thereof, of physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. Exculpatory evidence shall be produced under this article even though it is not intended for use at trial.
Except for certain statements not applicable here, the Louisiana Code of Criminal Procedure "does not authorize the discovery or inspection of reports, memoranda or other internal state documents made by the district attorney or by agents of the state in connection with the investigation or prosecution of the case; or of statements made by witnesses or prospective witnesses, other than the defendant, to the district attorney, or to agents of the state." La.C.Cr.P. art. 723.
Although defendant does not have a right to the names and addresses of state witnesses, the discovery of this information is not prohibited where there has been a determination that there exist peculiar and distinctive reasons why fundamental fairness dictates discovery. See La. C.Cr.P. art. 723; State v. Walters, 408 So.2d 1337, 1339 (La.1982); State v. Williams, 458 So.2d 1315, 1328 (La.App. 1st Cir.1984), writ denied, 463 So.2d 1317 (La.1985). Furthermore, rulings of the trial court in pretrial matters are generally shown great deference absent a clear showing of abuse of discretion. State v. Williams, 458 So.2d at 1328. Herein we note that there has been no argument by defendant nor any evidence in the record that any report of a physical or mental examination issued by Dr. Kelly was in the possession, custody, control, or knowledge of the district attorney or that one even existed. Additionally, under La.C.Cr.P. art. 723, defendant was not entitled to any statements which Dr. Kelly made to the prosecutor(s).
Furthermore, defendant has not made a showing as to how the testimony of Dr. Kelly violated his statutory or constitutional right to fundamental fairness. Although Dr. Kelly's testimony may have been in conflict with defendant's experts and there may have been some distinctions between his testimony and that of other state experts on the issue of defendant's sanity at the time of the offense, this evidence concerns the weight, not its admissibility.
As to defendant's argument that Dr. Applebaum and Dr. Kelly were unqualified under La.C.Cr.P. art. 650 to render expert opinions regarding defendant's sanity, we find no error.
La.C.Cr.P. art. 650 provides:
When a defendant enters a combined plea of "not guilty and not guilty by reason of insanity," the court may appoint a sanity commission as provided in Article 644 to make an examination as to the defendant's mental condition at the time of the offense. The court may also order the commission to make an examination as to the defendant's present mental capacity to proceed. Mental examinations and reports under this article shall be conducted and filed in conformity with Articles 644 through 646.
Under La.C.Cr.P. art. 644, the sanity commission members must by physicians (one member may be a Louisiana licensed psychologist) who are licensed to practice medicine in Louisiana. The Code of Criminal Procedure articles, upon which defendant *295 relies, provide requirements for the sanity commission members, not expert witnesses testifying at trial. We note also that, under La.C.Cr.P. art. 646, a court ordered mental examination does not deprive either the defendant or the district attorney of the right to an independent mental examination by a physician of his choice.
Additionally, defendant argues that the state improperly reserved evidence regarding the sanity issue for rebuttal testimony after the defendant presented his case in chief. He argues that, because defendant bore the burden of proving his defense, he was prevented from effectively refuting the state's witnesses, particularily Dr. Kelly. On the morning of the second day of trial, prior to the presentation of testimony, the state filed a motion to have Dr. Kelly make an independent mental examination of defendant. The state, pursuant to a court order, previously had Dr. Aris Cox, another psychiatrist, make an independent examination of defendant. (Dr. Cox found that defendant was legally insane at the time of the offense, and he subsequently testified for the defense.) At trial, when the state made its motion that defendant be examined by Dr. Kelly, defendant requested that he be examined before defense witnesses testified, so that they could "comment on the way this examination is being conducted at the last minute two years after the crime." The trial court granted the state's motion and ruled that it would not recess the case pending that examination by the state's expert.
Additionally, defendant makes a convoluted argument that in a case involving an insanity defense, it was error for the state not to present evidence of defendant's sanity on its case in chief and to reserve such evidence for rebuttal. He further argues that he was not given the opportunity for surrebuttal. As to this argument, we note that defendant did not make any request for surrebuttal and, thus, he has waived any error. See State v. Parker, 536 So.2d 459, 462 (La.App. 1st Cir.1988).
In fact, defendant's primary argument is that defendant should not have had the burden of proving insanity at the time of the offense. If defendant's argument were followed, the state would always be required to present evidence of defendant's sanity on its case in chief, thus, eliminating the presumption under La.R.S. 15:432 that defendant is presumed sane at the time of the offense. Additionally, it is not unconstitutional to require a defendant to bear the burden of proof on the defense of insanity. State v. Nelson, 459 So.2d 510, 517 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985). We find no error in the state's presentation of evidence regarding defendant's sanity on its case in rebuttal.
These assignments of error lack merit.

MOTION FOR MISTRIAL

(ASSIGNMENT OF ERROR NUMBER SIX)
By this assignment of error, defendant contends that the trial court erred in not granting his motion for mistrial after a state rebuttal witness, on direct examination, began to make a reference to a "similar incident," several years earlier, in which defendant indicated he was a danger to himself or others. Defendant complains of testimony elicited when the prosecutor was questioning Dr. Applebaum:
DR. ALAN APPLEBAUM:
Q. Did he ever exhibit to you or did you ever come to learn of any combination of any behavior that would indicate to you that the defendant would be a danger to himself or others?
A. Yes.
Q. When was that?
A. In a variety of ways, he talked about a similar incident. He did talk about the alleged incident of what happened, his version of it. He talked about a similar incident eight years
BY MR. CARDONE:
Objection, your Honor.
BY THE COURT:
Sustained.
BY MR. CARDONE:
Admonish the jury.
BY MR. KNIGHT:

*296 You can't talk about similar incidents.
BY THE COURT:
Ladies and gentlemen, I instruct you to disregard any statement this witness made about similar incidents.
BY MR. CARDONE:
We ask for a mistrial. We asked for it in limine, Your Honor. They know better than that.
BY THE COURT:
Motion is denied.
After the defense rested its case (and prior to rebuttal by the state) defendant made a motion in limine to require the state to instruct its witnesses not to refer to any other crimes that defendant may have committed. The prosecutor stated it had complied with this request, and the trial court granted the motion. That portion of the transcript is as follows:
BY MR. CARDONE:
I have a motion in limine, Your Honor, asking this Honorable Court to instruct the District Attorney's Office to instruct its witnesses who are about to testify not to make mention of any other crimes that the defendant may have legally [sic] committed at another time or place.
BY MR. KNIGHT:
I would like the record to reflect that I have spoken to Dr. [sic] Applebaum and Jiminez and instructed them not to mention in their testimony this afternoon any evidence or any facts, statements about any other crimes the defendant may have or may not have committed.
BY THE COURT:
And the defense motion is granted.
La.C.Cr.P. art. 771 provides, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
* * * * * *
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Under La.C.Cr.P. art. 771, it is within the trial court's sound discretion to grant a mistrial if he believes that an admonition is insufficient to assure the defendant a fair trial. State v. Jones, 451 So.2d 1181, 1184 (La.App. 1st Cir.1984). The ruling of the trial court will not be disturbed on review absent an abuse of discretion. State v. Narcisse, 426 So.2d 118, 133 (La.), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); State v. Taylor, 553 So.2d 873, 882 (La.App. 1st Cir.1989), writ. denied, 558 So.2d 600 (La.1990).
In the instant case, the answer by the witness was beyond the scope of the question asked by the state. The prosecutor asked Dr. Applebaum when he learned of other behavior by the defendant that would be a danger to himself or to others or when the defendant exhibited the behavior; the witness was not asked to relate the actual behavior.
Furthermore, a statement is not chargeable to the state solely because it was in direct response to questioning by the prosecutor. See State v. Taylor, 553 So.2d at 882. Moreover, the trial judge admonished the jury to disregard any reference to similar incidents. Reviewing the record, we find no abuse of discretion in denying defendant's motion for mistrial.
This assignment lacks merit.

CLOSING ARGUMENT

(ASSIGNMENT OF ERROR NUMBER SEVEN)
By this assignment of error, defendant contends that the state made improper statements in its rebuttal closing argument. *297 Specifically, defendant argues that the state made improper references to the consequences of a not guilty by reason of insanity verdict and to a witness' son who also saw the shooting.
Defendant specifically complains of the portion of the state's closing argument as follows:
There's another accusation here he makes that we're bringing fraudulent evidence in front of you. Boy, he's going to a lot of extremes, isn't he? A lot of extremes to get his client off. Mr. Ondek in this defense cheapens the law in this Parish. This defense in this case under these facts and under these circumstances insults my intelligence. And then he tells you that Dr. Scrignar put it all into context. To compare, I just want you to do this and just compare, try to go back and remember Dr. Scrignar's testimony, and then remember Dr. Kelly's testimony today. And ask yourself, who between Dr. Scrignar and Dr. Kelly put the case into context?
This is the real world, ladies and gentlemen of the jury. And then he went on and talked about mental illness. Mental illness is real. But so is murder. Murder is real, ladies and gentlemen. Murder in St. Tammany Parish is real. The defendant has not, according to the facts in evidence, the defendant has not been a danger to himself or to others since about early in January of 1988. And here it is well, February 1990. That's over two years. The evidence shows that the defendant has not been a danger to himself or to others for over two years. Keep that in mind when you consider your verdict in this case.
BY MR. CARDONE:
Your Honor, I want to object to that for the record.
BY THE COURT:
Objection is noted.
BY MR. CARDONE:
Thank you.
BY MR. KNIGHT:
You have heard it all. I don't have to repeat the definition of insanity for you again. Thank you again for your time and attention. I ask you to reach a verdict in this case. Reach a just verdict in accordance with the law, in accordance with the rules, and in accordance with the guidelines, and in accordance with the evidence that you have heard in this trial. And I'm going to ask you to do one more thing. I'm going to ask you to render a verdict in this case that Michael Messina's nine year old son, now eleven years old, who witnessed this murder, remember Michael Messina's nine year old son, render a verdict in this case that that eleven year old boy will understand. Thank you very much for your time and your attention.
BY MR. CARDONE:
Objection to that, Your Honor, as well.
The scope of the closing argument is limited to the evidence admitted, the lack of evidence, conclusions of fact drawn therefrom and the law applicable to the case. La.C.Cr.P. art. 774; State v. Savoie, 448 So.2d 129, 135 (La.App. 1st Cir.), writ denied, 449 So.2d 1345 (La.1984). If oral argument goes beyond these limits, it may fall within the ambit of La.C.Cr.P. arts. 770 and 771. When such remarks are made in the presence of the jury, either a mistrial or admonition may be proper. La.C.Cr.P. arts. 770, 771; State v. Savoie, 448 So.2d at 135. However, before a verdict will be overturned on the basis of improper argument, the court must be thoroughly convinced that the comment influenced the jury and contributed to the verdict. State v. Bell, 477 So.2d 759, 768 (La.App. 1st Cir.1985), writ denied, 481 So.2d 629 (La. 1986). In determining whether improper argument has contributed to the verdict, a reviewing court should accord credit to the good sense and fairmindedness of the jurors who have heard the evidence. State v. Jarman, 445 So.2d 1184, 1188 (La.1984).
The trial court instructed the jurors thoroughly prior to their retiring to deliberate. It stressed that the opening and the closing arguments of the attorneys were not evidence. Furthermore, in the jury instructions, the trial court explained the procedure which would follow if defendant were found to be not guilty by reason *298 of insanity, including defendant's remand "to the Parish jail or to a private mental institution approved by the Court." Also, the trial court instructed the jurors that they were not to be influenced by sympathy, passion, prejudice or public opinion. We are not convinced that the portions of the state's closing argument, of which defendant complains, unduly influenced the jury or contributed to the verdict.
This assignment lacks merit.

SEQUESTRATION OF WITNESS

(ASSIGNMENT OF ERROR NUMBER NINE)
By this assignment of error, defendant complains that his Sixth Amendment right to cross-examination was violated when the trial court allowed Chief Thomas Buell, the state's designated representative, to be excluded from the sequestration order for witnesses. He argues that Chief Buell either should have testified first or should have been excluded from the courtroom until his testimony.
The purpose of sequestration is to assure that a witness will testify as to his own knowledge of events, to prevent the testimony of one from influencing the testimony of others, and to strengthen the role of cross-examination in developing facts. State v. Burge, 486 So.2d 855, 863-864 (La.App. 1st Cir.), writ denied, 493 So.2d 1204 (La.1986).
The resolution of sequestration problems is within the sound discretion of the trial court. On appeal, the reviewing court will look at the facts of each case to determine whether or not a sequestration violation resulted in prejudice to the accused. State v. Lopez, 562 So.2d 1064, 1066 (La.App. 1st Cir.1990).
Louisiana Code of Evidence Article 615A[4] provides, in pertinent part:
On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion. However, this Article does not authorize exclusion of:
* * * * * *
(2) A single officer or single employee of a party which is not a natural person designated as its representative or case agent by its attorney;
Comment (d) to Louisiana Code of Evidence Article 615 provides, in pertinent part:
On the other hand, the exemption of representatives may, if mechanically applied, result in manifest unfairness such as by undermining the right to meaningful cross-examination. Nothing in this Article is intended to deprive the trial court of the power to sequester witnesses in such cases in the interests of justice. See C.Cr.P. Art. 17. Such a potentially prejudicial situation is presented, of course, in criminal cases when a law enforcement officer who is designated as the state's representative is expected also to testify as a fact witness. In such a situation the court should take appropriate measures to minimize the possibility of prejudice, *299 such as permitting the case agent to be designated as the state's representative only if he testifies prior to all other fact witnesses. (Emphasis added)
At trial and in his brief, defendant argues that Chief Buell's testimony as to defendant's condition and actions was influenced by the prior testimony of "six lay witnesses" and two officers. He specifically argues that effective cross-examination of Chief Buell was thwarted because Chief Buell, the officer who obtained defendant's statement, was aware of the defense's focus from listening to the cross-examination of previous witnesses.
Chief Buell testified regarding the Miranda rights given to defendant and defendant's subsequent statements. He also gave testimony about defendant's condition, appearance, and behavior after defendant was stopped and prior to when he gave the statements. Chief Buell was the first witness to testify as to the administration of Miranda rights to defendant, about the lack of duress, threats, promises or inducements made to defendant and about the chain of custody of the taped statement. Furthermore, Chief Buell previously testified at defendant's motion to suppress and was obviously aware of defendant's theory of defense.
In the instant case, we find no error in the trial court's ruling to allow Chief Buell to be exempted from the sequestration order. Chief Buell was the first witness to testify regarding defendant's statements. Furthermore, no prejudice resulted to defendant when Chief Buell remained in the courtroom.
This assignment lacks merit.

VOIR DIRE EXAMINATION

(ASSIGNMENT OF ERROR NUMBER TEN)
By this assignment of error, defendant contends the trial court improperly limited the questioning on voir dire of prospective jurors about the insanity defense. Specifically, defendant argues that he was prevented from fully testing the prospective jurors' understanding of the burden of proving insanity and of the consequences of an insanity verdict. The pertinent parts of the voir dire colloquy between defense counsel and two prospective jurors are as follows:
(VOIR DIRE OF MS. WILSON)
BY MR. CARDONE:
I want to talk about not guilty and not guilty by reason of insanity. It encompasses behavior that ordinarily you may not think a plea of that nature would encompass. Let's assume that for purposes of this discussion here that this pen is your pen, and I take it and convert it to my own use and put it in my pocket. However, the Judge rules Cliff Cardone at the time he took that pen was insane, was incapable of distinguishing right from wrong. You, as a jury, would have to find me not guilty and not guilty by reason of insanity, even though you all saw me take the pen, even though I'm guilty of taking the pen.
BY MR. KNIGHT:
Judge, first of all, you don't make the decision as to whether or not Mr. Cardone is insane. The jury makes that decision based upon the specific fact that they saw him take the pen, the facts and circumstances surrounding the event. The State would object to this, if it's a question, to the question.
BY THE COURT:
I sustain the objection. I don't think it's a fair hypothet [sic], because I would not make the determination as to sanity or insanity.
* * * * * *
(VOIR DIRE OF MS. WILLIAMS)
Do any of you think that the law that allows an insane person to go to a mental institution is fundamentally wrong, or you think that a person who is criminally insane should go to prison instead of a mental institution? Because if you find him not guilty by reason of insanity, he would go to a mental institution rather than prison.
And that's the function of the Judge. Not you. And it's something you shouldn't concern yourself with. But I *300 know, I have been doing this long enough to know, and you go back to the jury room, and you will be talking about that. So I want to get it right up front. Let me ask you this question. It's more difficult. What if you knew that he could be released from the mental institution upon certain showings to the Court? What if you knew that?
BY MS. WILLIAMS:
I have a problem with that.
BY MR. CARDONE:
Is that something you're going to talk about in the jury room?
BY MR. KNIGHT:
How can he ask them what they're going to talk about when they deliberate?
BY THE COURT:
Ladies and gentlemen, that has absolutely nothing to do with your function in the trial. I'm just about, I think, to put an end to it. Your responsibility in this trial is to determine guilt, innocence, not guilty by reason of insanity. I will instruct you that insanity, as defined by the law, is a defense. It relieves one of criminal responsibility. Can you accept that? Can you accept all the instructions I'm going to give you on the law? And I suggest to you that in the event you should find this defendant not guilty and not guilty by reason of insanity, you're finished with this case. It's in my hands at that time. What happens on down the road is between the psychiatrist and this court and the law of this State that has been passed by the Legislature. Can each of you accept this and not get involved in this in your deliberations in this case? This has nothing to do with this case. That's the reason I say I'm about to stop it as far as interrogation by the defense attorney. I think it's a waste of your time and my time. Proceed and let's get an end to it very quickly.
An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination and to the exercise of peremptory challenges. La. Const. art. I, § 17. La.C.Cr.P. art. 786 provides that the court, the state and the defendant shall have the right to examine prospective jurors and the scope of the examination shall be within the discretion of the court. The purpose of voir dire examination is to determine prospective jurors' qualifications by testing their competency and impartiality and to discover bases for intelligent exercise of cause and peremptory challenges. The scope of voir dire examination is within the sound discretion of the trial court, and its rulings will not be disturbed on appeal in absence of a clear abuse of discretion. A review of the trial court's rulings should be undertaken only on the record of the voir dire examination as a whole to determine whether a sufficiently wide latitude was afforded the defendant in examining prospective jurors. State v. Burton, 464 So.2d 421, 425 (La.App. 1st Cir.), writ denied, 468 So.2d 570 (La.1985).
We find no abuse of discretion in the trial court's rulings limiting defense counsel's questions. A review of the entire voir dire transcript shows that the trial court's limitation in these two instances did not unfairly restrict defendant's opportunity to fully examine the prospective jurors.
This assignment of error lacks merit.
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Defendant also moved to suppress several other statements; these were ultimately ruled inadmissible by the Louisiana Supreme Court and were not introduced at trial. State v. Ondek, 551 So.2d 1312 (La.1989).
[2] The Louisiana Supreme Court granted writs, stating"court of appeal reversedruling of district court reinstated." State v. Ondek, 550 So.2d 640 (La.1989). Defendant applied for a motion to clarify which the Louisiana Supreme Court granted with the language, "The first confession is admissible;...." State v. Ondek, 551 So.2d 1312 (La.1989).
[3] In State v. Skiffer, the state admitted that defendant was not advised of his constitutional rights in accordance with Miranda; therein, the defendant was not informed that he was entitled to court-appointed counsel if indigent. The Louisiana Supreme Court stated in Skiffer, "Such an admitted failure is sufficient under Miranda to require the suppression of a statement under custodial interrogation...." State v. Skiffer, 218 So.2d at 314.
[4] Former LSA-C.Cr.P. Art. 764 provided:

A. Upon its own motion the court may, and upon request of the state or the defendant the court shall, order that the witnesses be excluded from the courtroom or from where they can see or hear the proceedings and refrain from discussing the facts of the case or the testimony of any witness with anyone other than the district attorney or defense counsel. The court may modify its order in the interest of justice.
B. This Article shall authorize the exclusion of all witnesses except the defendant and one officer or employee of the state who is designated as its representative for the entire trial by the district attorney. This officer or employee of the state shall refrain from discussing the facts of the case or the testimony of any witness with anyone other than the district attorney or defense counsel.
LSA-C.Cr.P. Art. 764 now provides:
The exclusion of witnesses is governed by Louisiana Code of Evidence Article 615.